[No. A112331. First Dist., Div. Two. Nov. 13, 2006.]

HENRY PARRA, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

EDMUND COTA et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

## Counsel

Ropers, Majeski, Kohn & Bentley, James A. Lassart and Adrian Driscoll for Plaintiff and Appellant Henry Parra.

Arthur K. Wachtel, Maitreya Badami; Furst & Pendergast, Peter Furst; Stiglich, Hinckley & Burrell, Lidia Stiglich; Leland Davis III; and William Fazio for Plaintiffs and Appellants Edmund Cota et al.

Dennis J. Herrera, City Attorney, Danny Y. Chou, Chief of Appellate Litigation, Molly S. Stump, Chief Attorney, David A. Carrillo, Deputy City Attorney, for Defendants and Respondents.

## Opinion

**RICHMAN, J.**—This case of first impression involves the application of the one-year limitation provision governing discipline of police officers contained in the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.), and particularly whether that provision was tolled or extended. The

issue arises out of the investigation of, and the criminal charges filed in connection with, the notorious incident in November 2002 involving three off-duty San Francisco police officers which came to be known as "Fajitagate."

Appellants here, petitioners below, are seven San Francisco police officers who became involved in various ways with the incident, and were charged with violations of departmental orders and rules of conduct. The charges were not brought until July 2004, and appellants filed motions to dismiss them as untimely. The motions were denied by the San Francisco Police Commission, and appellants' petitions for administrative mandamus were denied by the superior court.

We conclude that at least one tolling provision and one extension provision applies in the circumstances here, the effect of which was to extend the limitation provision and render the charges timely. We thus conclude that the trial court's order was correct, and we affirm.

## I. BACKGROUND

### A. *The November 20, 2002 Incident and Its Aftermath*

Early in the morning hours of November 20, 2002, Adam Snyder called 911, to report that he and Jade Santoro had been attacked in the Marina District of San Francisco by three men who fled in a pickup truck. Sergeant John Syme was in charge of Northern Station at the time and responded to the call, along with Officers Daniel Miller and Gene Cornyn. As they were interviewing Snyder and Santoro, a pickup truck with three men inside drove by, and Snyder identified them as the attackers; at the same time, Syme recognized the driver as an off-duty San Francisco police officer. Syme and another officer pursued the truck and stopped it several blocks away, to learn that all three men were off-duty San Francisco police officers—Matthew Tonsing, David Lee, and Alex Fagan, Jr. Fagan was the son of the newly appointed Assistant Chief of Police Alex Fagan; Lee was the son of a San Francisco police sergeant.

The incident and its aftermath became a "cause celebre," and because the charges included that an officer demanded the steak fajitas Snyder had ordered, the incident came to be referred to in the press as "Fajitagate," the fallout from which continues to this day. That fallout included criminal indictments against 10 officers, a federal civil case, a state civil case, and reams of publicity.[1] It also included extensive investigations, both criminal

---

[1] The publicity was so notorious that off-duty officer Fagan was successful in his motion to change the venue of the criminal case brought against him.

and administrative, by the San Francisco Police Department. And it included the disciplinary charges in issue here, brought in July 2004 against the seven appellants: Captain Gregory Corrales, Lieutenants Edmund Cota and Henry Parra, Sergeant Syme, Inspector Paul Falconer, and Officers Miller and Cornyn (when referred to collectively, Appellants).

### B.  *The Police Department Investigation*

Immediately after the incident the San Francisco Police Department began both a criminal investigation and an administrative investigation into the conduct of the three off-duty officers and also the possible misconduct of numerous other officers in connection with their involvement and handling of the incident. The full breadth of these investigations is not particularly germane to the issues on appeal, and is not in the record in any event. What we do glean from what is before us shows that the police department investigations were extensive and far reaching, manifest, for example, by letters and memoranda from or to the chief of police, the deputy chief, the commanding officer, legal division, the commanding officer, risk management office, various personnel at the management control division, and numerous others. It was, as one appellant's counsel would later describe it, "huge in scope."

And while the police department's investigations are not themselves particularly pertinent, what is pertinent is the police department's cooperation—perhaps more accurately, lack of cooperation—with the Office of Citizen Complaints (OCC), which interaction is discussed in detail below, in part I.D., *post.*

### C.  *The District Attorney Investigation and the Criminal Charges*

The San Francisco District Attorney also began his own investigation, the result of which was the presentation of a case to the grand jury. Forty-two witnesses testified, including all seven Appellants, and on February 27, 2003, the grand jury indicted a total of 10 San Francisco officers. The three off-duty officers were charged with several counts arising from the incident itself. Seven other officers were charged with conspiring to obstruct justice, including Police Chief Earl Sanders, Assistant Chief Fagan, Deputy Chiefs Gregory Suhr and David Robinson, and three appellants, Captain Corrales, Lieutenant Cota, and Sergeant Syme. These indictments generally alleged that the seven officers promoted misinformation about the incident and, as to Cota and Syme, that they failed to follow proper procedures in their investigation.

On April 4, 2003, the superior court dismissed the indictments against all defendants except the three off-duty officers accused in the incident. The basis

of the dismissal of the other seven officers was that there was no conspiracy. While so ruling, however, the superior court made various observations pertinent here, including that "[c]learly preferential treatment was accorded [the off-duty officers]. Much of these actions have been clearly laid out and are known. [¶] If these actions were obstructions of justice, then those types of charges should be brought."

### D.  *The Office of Citizen Complaints Investigation*

Penal Code section 832.5 requires local agencies that employ peace officers to adopt a procedure for investigation of citizen complaints of misconduct against such officers. In 1982 the voters amended the Charter of the City and County of San Francisco (Charter) to create the OCC as the department responsible for investigating complaints against San Francisco officers. (See *San Francisco Police Officers' Assn. v. Superior Court* (1988) 202 Cal.App.3d 183, 185 [248 Cal.Rptr. 297] (*S.F. Police Officers' Assn.*); Charter, §§ 4.127 & A8.343 (appen.).) The OCC is under the supervision and management of the San Francisco Police Commission (Commission). (Charter, § 4.127.)

The OCC is a civilian agency, separate from the police department (*S.F. Police Officers' Assn., supra,* 202 Cal.App.3d at pp. 186–188), and Charter section 4.127 imposes on the OCC the duty to investigate complaints of police misconduct and to recommend nonbinding disciplinary action to the chief of police. This recommendation is "advisory only." (*S.F. Police Officers' Assn., supra,* 202 Cal.App.3d at p. 185.)[2]

On November 25, 2002, a citizen's complaint was filed with the OCC by Sean Buckley. Buckley was not involved in the incident in any way, and was complaining as a concerned citizen, apparently based on newspaper accounts he had read about the investigation of the incident. Buckley's complaint identified by name at least 10 police officers, including appellants Corrales, Parra, Syme, Miller, and Cornyn. The essence of Buckley's complaint was that the officers had committed misconduct by failing to properly investigate the underlying incident and what he referred to as "the apparent selective enforcement of the law." It went on to state, "The complainant further stated that citizens can not tolerate a double standard where police officers receive special treatment from other police officers. The complainant also expressed concerns regarding the impartiality and objectivity of having the police investigate other police officers. The complainant added that this type of activity repeatedly occurs throughout the country and he found it shocking

---

[2] Charter section 4.127 also provides that the OCC's duty does not prohibit the chief of police from independently investigating an officer's conduct and does not otherwise limit the chief's disciplinary powers under the Charter.

that it would occur in San Francisco. The complainant concluded his interview by stating that these types of occurrences make the public mistrust the police and not cooperate with police."[3]

The OCC immediately began to investigate Buckley's complaint, under the supervision of OCC Director Kevin Allen. The investigation would proceed for some 20 months, and would come to involve 28 separate allegations of possible misconduct, against 12 different officers. The investigation would include the collection, assimilation, and analysis of voluminous material, including that developed independently by OCC as well as the police department and district attorney's investigations. The investigation culminated in an 80-page report from the OCC, the upshot of which was that five of the 12 officers being investigated were not charged, and that seven, Appellants here, were.

The investigation began on November 25, 2002, the day Buckley's complaint was lodged, when the OCC investigator sent a memorandum to "SFPD Legal" requesting it to "provide any and all reports to include chronologies, investigative findings and conclusions, photographs, crime scene drawings/sketches, medical examiner files/records, and all audio/video tape recordings." This was followed two days later by a request for specific telephone records of 13 officers, including those of appellants Corrales, Parra, Cota, and Syme. A third request was made on December 17, 2002, seeking seven specific categories of materials. Meanwhile, the OCC began to independently interview witnesses, conducting numerous interviews by the end of December 2002.

The record does not contain the police department's responses, if any, to the three requests from the OCC. What is in the record is a March 19, 2003 letter from the acting director of the OCC to the Commission memorializing the developments to date, and referring to various exhibits filed under seal. This letter reads in pertinent part as follows: "On January 14, 2003, the OCC requested by letter that Police Legal review the November 25, November 27 and December 14 letters again to release any documents that did not compromise the ongoing criminal investigation. As to those documents that Police Legal was not releasing, the OCC requested that Police Legal provide a reason for the non-disclosure and an estimate as to when the documents would become available. (See Exhibit C, filed under seal with the Police Commission's secretary.)

"Throughout January, February and March of 2003, in addition to numerous phone calls to Police Legal, the OCC enlisted the assistance of Deputy

---

[3] A second citizen's complaint was filed on March 3, 2003, by Ray Hartz, Jr. He, too, had no direct connection with the incident.

Chief Heather Fong, and City Attorneys Lori Giorgi, Mariam Morley and Dorji Roberts to resolve the Department's failure to comply with OCC's document requests. In mid-February, Police Legal stated that the OCC's document requests had been forwarded to the District Attorney. (See Exhibit D, filed under seal with the Police Commission's secretary.)

"On March 14, 2003 City Attorney Mariam Morley spoke with District Attorney Al Murray who informed her that the District Attorney's office was taking no position as to the OCC request for documents. Upon learning of the District Attorney's position, the OCC informed Mariam Morley that the OCC was demanding the immediate release of all documents in connection with the Union Street incident. The OCC called Deputy Chief Fong, informed her of the District Attorney's position and stated that the OCC was demanding the release of all documents by Wednesday, March 19 at noon.

"Today at 12:52 p.m. the OCC received a letter from Police Legal stating that it would not provide the requested materials because of the District Attorney's letter dated March 19th indicating that the integrity of the criminal investigation may be jeopardized by the disclosure of the requested information outside of the framework of the criminal prosecution. (Exhibit E, filed under seal with the Police Commission's secretary.)

"The public demands a timely and unbiased investigation into the allegations of police misconduct concerning the Union Street incident. The City Charter mandates that the OCC conduct such an investigation and this agency is more than prepared to do so. Any information obtained during an OCC investigation is confidential and cannot be released or used for any other purpose outside of an administrative investigation absent a court order. While steadfast and aggressive in its attempt to investigate the allegations of police misconduct in this complaint, the OCC is severely hampered in these efforts by the non-cooperation of the SFPD and District Attorney to provide the OCC the most basic of documents—including the incident report. We request that the Police Commission assist the OCC in acting on its Charter—granted authority to obtain the documents necessary for the timely completion of this investigation."

According to various entries in the OCC work summary, on March 28, 2003, the police department again refused requests for materials. Then, beginning on April 16, 2003, OCC began to receive what is described as "highly redacted and incomplete records consisting only of those documents 'in the possession of MCD [Management Control Division] and the media.' "

OCC Staff Attorney Marion apparently requested additional materials, again without success, as by letter of May 8, 2003, the police department

offered explanations why certain of the documents requested would not, or could not, be produced. On May 12, 2003, OCC received some telephone records, and on May 14, 2003, "3 volumes of reading materials from SFPD documenting the Dept.'s investigation."

The record is virtually silent as to developments in the next few months, until a letter of September 25, 2003, in which OCC "renew[ed]" its request for various items which the police department's letter of May 8, 2003, indicated would not, or could not, be produced. On October 10, 2003, the commanding officer of the police department legal division sent a memorandum to the investigations bureau referring to four of the requests in the September 25 letter, and requesting those materials be furnished to him by October 16, 2003. This memorandum closes with the advice that the "District Attorney has been notified of the September 25, 2003 request for materials. All other materials listed in the September 25, 2003 request have been provided to OCC." Two weeks later, by letter of October 22, 2003, the commanding officer of the police department legal division advised the director of OCC that the materials in the October 10, 2003 memorandum were available.

On November 12, 2003, the risk management office of the police department issued a memorandum to the management control division, stating that "Management Control Division case files are personnel records pursuant to Section 832.5 of the California Penal Code. As such, Management Control Division Case Number A456-02 is confidential per Section 832.7 of the California Penal Code and cannot be disclosed in any criminal or civil proceeding except by discovery pursuant to Sections 1043 and 1046 of the California Evidence Code. [¶] Therefore, you cannot discuss or release any part of the case file with anyone who is not a member of management of the San Francisco Police Department without a court order." This memorandum was interpreted by OCC, apparently accurately, as "forbidding the Management Control Division investigator from being interviewed or providing his chronology as requested by the OCC."

For reasons unexplained in the record, the police department apparently began to change its tune, and a December 3, 2003 memorandum from Commanding Officer Keohane to OCC (and others) advised that the "City Attorney has advised the Department to release the MCD documents you sought in your letter of" September 25, 2003. This material was in fact forwarded by letter of December 5, 2003. Finally, by memorandum of December 11, 2003, Captain O'Leary of the risk management office advised that he had received advice that "allows me to rescind" the order of November 12, 2003, and instructing that "[y]ou may now cooperate with [OCC] in their investigation . . . ." In sum, it was not until mid-December

2003 that OCC finally gained meaningful access to the police department's investigation and the opportunity to interview its investigator.

Shortly thereafter, the OCC began its interviews of Appellants and numerous other witnesses. The first appellant interviewed was Officer Cornyn on January 28, 2004, followed by interviews of Captain Corrales on February 20, Sergeant Syme on February 21, Lieutenant Cota on February 23, Lieutenant Parra on March 2, Officer Miller on March 8, and Inspector Falconer on March 12. In all, the OCC interviewed a total of 42 witnesses, 39 of whom were police department employees or former employees.

Meanwhile, on February 6, 2004, OCC renewed its request for the log of the operations center, which it received on February 24, 2004. And on March 15, 2004, OCC requested the SID investigative analysis. When all was said and done, OCC had obtained and reviewed over 7,000 pages of documentary evidence, countless pages of transcripts of interviews, including the 1300-plus page grand jury transcript, and those of the numerous witnesses, voluminous telephone records and photographs, and myriad other documents.[4] And the result of all this was OCC's "sustain report" and a draft of possible charges to be filed with the Commission prepared for the chief of police.

### E. *The Civil Lawsuit*

While all that was going on at OCC, on November 5, 2003, Snyder and Santoro filed a civil action in the United States District Court, Northern District of California: *Snyder v. City and County of San Francisco* (No. C-03-4927 JSW). The complaint named as defendants the City and County of San Francisco, Chief Sanders, Assistant Chief Fagan, Deputy Chief Robinson, Captain Corrales, and Sergeant Syme; it also named 20 Doe defendants.[5] Answers were filed in this action, and it remained pending as of the time of the proceedings below. Subsequently, in November 2005, Chief Robinson, Captain Corrales, and Sergeant Syme were dismissed on stipulation, and in April 2006 the United States District Court granted summary judgment for the remaining defendants.

---

[4] As Director Allen was coordinating the OCC investigation, in March 2004 he met with representatives of the Kroll Worldwide, an investigative agency that he understood was in negotiations with the police department to review and investigate the matters being investigated by the OCC. Allen thereafter learned that Kroll and the police department entered into some contract, in connection with which Kroll requested that the OCC provide its evidence electronically. Though this was contrary to the OCC's customary practice, during the months of June and July 2004, working in coordination with Captain Denis O'Leary of the police department, Allen personally converted and/or caused to be converted some 5,000 pages of the OCC investigative file into the PDF format requested by Kroll.

[5] On November 5, 2003, Snyder and Santoro also filed a civil action in the Superior Court of San Francisco, Civil Action No. CGC-03-426098, naming as defendants the three off-duty officers.

## F. *The Disciplinary Charges*

As noted, in July 2004, OCC Director Allen provided drafts of OCC's 80-page report and possible charges to the chief of police and, pursuant to the obligations under the Charter, met with her regarding the possible filing of the charges with the Commission. Following that meeting, on July 22, 2004, Director Allen signed the separate charges against each of the seven Appellants, which were served and filed with the Commission by July 26. The charges accused Appellants of various violations arising out of their roles in the incident and/or its investigation and, in the case of Captain Corrales, statements to the media. The actual facts claimed to support the charges against the officers are not in the record in any testimonial way. All we have are the allegations in the charges, yet unproved, and these claimed facts will not be set forth here. The charges themselves are as follows:

Captain Corrales—conduct reflecting discredit for making improper comments during a pending investigation, in violation of departmental general orders 2.01 and 8.09.

Lieutenant Parra—neglect of duty for failing to conduct a prompt and proper investigation and for engaging in selective enforcement of the law and department procedures, in violation of department general orders 1.06 and 2.01.

Lieutenant Cota—neglect of duty for failing to conduct a prompt and proper investigation in violation of department general orders 1.06, 2.01 and 8.01; neglect of duty for failing to conduct and/or cooperate with a prompt and proper administrative investigation, in violation of department general orders 1.06, 2.01 and 8.01; unwarranted action for ordering the prolonged detention of a civilian in violation of department general orders 1.06, 2.01 and 5.03; and conduct reflecting discredit for engaging in selective enforcement of the law and department procedures, in violation of department general order 2.01.

Sergeant Syme—neglect of duty for failure to conduct a prompt and proper investigation, in violation of department general orders 1.04, 1.06, 2.01 and 8.01; neglect of duty for failure to maintain proper police communications, in violation of department general orders 1.03 and 1.04; unwarranted action for ordering the prolonged detention of a civilian in violation of department general orders 1.04, 2.01 and 5.03; and conduct reflecting discredit for engaging in selective enforcement of the law and department procedures, in violation of department general order 2.01.

Inspector Falconer—neglect of duty for failure to conduct a prompt and proper investigation, in violation of department general orders 1.06 and 2.01.

Officer Miller—neglect of duty for failing to take required action to preserve evidence and a crime scene, in violation of department general orders 2.01, 6.01 and 6.02; and neglect of duty for failing to maintain proper police communications in violation of department general orders 1.03 and 2.01.

Officer Cornyn—neglect of duty for failing to maintain proper police communications, in violation of department general orders 1.03 and 2.01.

### G. The Public Safety Officer's Procedural Bill of Rights Act

█ In 1976, the Legislature enacted chapter 9.7 of the Government Code (section 3300 et seq.), known as the Public Safety Officers Procedural Bill of Rights Act (the Act).[6] The Act has been described as "primarily a labor relations statute. It provides a catalog of basic rights and protections that must be afforded all peace officers by the public entities which employ them. [Citations.]" (California Correctional Peace Officers Assn. v. State of California (2000) 82 Cal.App.4th 294, 304 [98 Cal.Rptr.2d 302], fn. omitted.) In the words of the Supreme Court, the Act is "concerned primarily with affording individual police officers certain procedural rights during the course of proceedings which might lead to the imposition of penalties against them . . . ." (White v. County of Sacramento (1982) 31 Cal.3d 676, 681 [183 Cal.Rptr. 520, 646 P.2d 191].) In sum, and as confirmed in Alameida v. State Personnel Bd. (2004) 120 Cal.App.4th 46, 63 [15 Cal.Rptr.3d 383], "the Act '. . . provides a catalog of basic rights and protections that must be afforded all peace officers by the public entities which employ them.' [Citation.] One such protection is to have a speedy adjudication of conduct that could result in discipline."

That protection is the limitation provision in issue here, which was added by amendment in 1997.[7] The provision is found in section 3304, subdivision (d), which provides a one-year limitation for disciplinary actions, subject to eight exceptions, four of which were relied on by OCC in the proceedings

---

[6] Unless otherwise indicated, all future statutory references are to the Government Code.

[7] The background and significance of this amendment were discussed in Jackson v. City of Los Angeles (2003) 111 Cal.App.4th 899, 908–909 [4 Cal.Rptr.3d 325]: "According to comments made by the author of Assembly Bill No. 1436 to Senate and Assembly committees during hearings on the 1997 amendment, the legislative purpose for enacting the section 3304, subdivision (d) statute of limitations provision was to reduce the limitations period for state peace officers from three years to one year, and to provide a one-year limitations period for local peace officers, who previously lacked any limitations period. A statute of limitations has a direct, substantial connection to the Legislature's purpose of maintaining stable employer-employee relations between public safety employees and their employers so as to provide effective law enforcement and effective services to all people of the State of California. (§ 3301.)" (Fn. omitted.)

here. As germane to the proceedings here, therefore, section 3304, subdivision (d) provides in pertinent part as follows:

"(d) Except as provided in this subdivision and subdivision (g), no punitive action . . . shall be undertaken for any act, omission, or other allegation of misconduct if the investigation of the allegation is not completed within one year of the public agency's discovery by a person authorized to initiate an investigation of the allegation of an act, omission, or other misconduct. This one-year limitation period shall apply only if the act, omission, or other misconduct occurred on or after January 1, 1998. In the event that the public agency determines that discipline may be taken, it shall complete its investigation and notify the public safety officer of its proposed disciplinary action within that year, except in any of the following circumstances:

"(1) If the act, omission, or other allegation of misconduct is also the subject of a criminal investigation or criminal prosecution, the time during which the criminal investigation or criminal prosecution is pending shall toll the one-year time period. [¶] . . . [¶]

"(3) If the investigation is a multijurisdictional investigation that requires a reasonable extension for coordination of the involved agencies.

"(4) If the investigation involves more than one employee and requires a reasonable extension for coordination of the involved agencies. [¶] . . . [¶]

"(6) If the investigation involves a matter in civil litigation where the public safety officer is named as a party defendant, the one-year time period shall be tolled while that civil action is pending."

## H. *The Police Commission Proceedings*

As noted above, under Charter section A8.343 the Commission has the authority to discipline police officers. On October 28, 2004, Lieutenant Parra filed with the Commission a motion to dismiss the charges as untimely. It was accompanied by a memorandum of points and authorities, a brief declaration of Lieutenant Parra, and a declaration of Attorney James Lassart, attached to which were seven exhibits, some of them quite lengthy. The other six appellants filed a similar motion, accompanied by a declaration of Attorney Arthur Wachtel, also with exhibits.[8] On November 17, 2004, OCC filed oppositions, which included a declaration of OCC Attorney Jean Field with 10 exhibits, and a declaration of OCC Director Allen with three exhibits. It is

---

[8] While each appellant has his own counsel, the six appellants other than Lieutenant Parra filed joint papers below, as they have here.

primarily from these many exhibits, all in the record without objection, that the factual record set forth above is found.

Following Appellants' replies, the motions came on for hearing before the Commission on February 9, 2005. The Commission heard over two hours of argument, including from four counsel on behalf of individual appellants. The Commission then retired to deliberate, and returned to orally announce its decision, denying the motion to dismiss.

By resolution of March 23, 2005, the Commission adopted its decision to deny the motions. There, after a lengthy recitation of facts, the Commission began its analysis, finding first, as the parties "agree[d]," that the district attorney began the criminal investigation immediately after the incident. And because that investigation resulted in the indictments of Captain Corrales, Lieutenant Cota, and Officer Syme, the one-year limitation period on the disciplinary charges against them did not begin to run until the indictments were dismissed on April 4, 2003, and thus would not expire until April 3, 2004. The Commission then concluded that, because the criminal investigation included "all of the conduct, indeed the very allegations, at issue in these administrative proceedings," the limitation provision was tolled as to all officers.

The Commission also found that, although five of the seven appellants were not named as defendants in the federal civil action, the action tolled the limitations period as to all appellants under section 3304, subdivision (d)(6). The Commission noted the inclusion of the Doe defendants and concluded that the conduct of all Appellants alleged in the administrative charges was "substantially similar to the allegations of unlawful conduct set forth in the civil complaint. Because of these factual similarities, the investigation of the named officers cannot reasonably be severed from the investigation of the other officers." Following that, the Commission concluded as follows:

"In light of the Commission's conclusions expressed in sections II(A)(1) and (2), above, this Commission has determined that the charges were timely served. This Commission also concludes, however, that Government Code sections 3304(d)(3) and (4), which provide for a reasonable extension of the statute of limitations, provide separate bases for concluding that the charges were timely served.

"1. Multiple Officers

"The parties agree that this investigation involved multiple officers. The question presented is whether the extension of the one-year statute of limitations in this case is reasonable.

"As the OCC argues, the scope and nature of its investigation were unprecedented. The OCC investigated 28 allegations against 12 members of the Department, including members of the command staff. The OCC was required to collect and analyze data resulting from its own efforts, and to consider as well materials provided as a result of the Department's criminal investigation, the District Attorney's criminal investigation, and the Department's administrative investigation. The OCC reviewed more than 7,000 pages of material, analyzing it for relevancy, consistency and evidentiary value. The OCC also interviewed 42 people, and compared many of those statement[s] to statements given by the same witnesses in the context of the other investigations.

"The parties agree that the statute of limitations in this investigation began to run on November 25, 2002, and that the officers were served with charges between July 22 and 26, 2004, a period of approximately 20 months. An extension of eight months beyond the twelve-month statutory period is reasonable in a multiple-officer case of this complexity. But an extension of eight months is not necessary to a finding that the service of the charges here was timely.

"As discussed above, the statute of limitations was tolled as to all the charged officers until April 4, 2003, during the pendency of the criminal investigation and prosecution. Therefore, even excluding any consideration of the tolling provided by section 3304, subdivision (d)(6), disciplinary charges were served approximately three and one-half months after the one-year period expired. This Commission concludes that an extension of three and one-half months is reasonable in the context of this multiple-officer case."

Finally, the Commission found that section 3304, subdivision (d)(3)—the multijurisdictional investigation provision—applied, and that a three-and-one-half month extension was reasonable.

I.  *The Petitions for Mandamus*

On April 13, 2005, Lieutenant Parra filed a petition for administrative mandamus (Code Civ. Proc., § 1094.5), naming as respondents the City and County of San Francisco (the City), the police department, and the OCC. Two days later a similar petition was filed on behalf of the other six appellants, along with a motion to consolidate. The City filed answers and opposition to the petitions, and Lieutenant Parra, his reply. The petitions came on for hearing on July 19, 2005, before the Honorable James Warren, who at the conclusion of argument took the matters under submission. On September 1, 2005, Judge Warren issued two orders. The first ordered the petitions consolidated. The second denied them.

Judge Warren's order denying the petitions expressly noted that he was properly applying the requisite test, exercising his independent judgment. (See *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143–144 [93 Cal.Rptr. 234, 481 P.2d 242]. Doing so, Judge Warren also noted, also properly, that he must give the administrative decision a "strong presumption of correctness." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 [85 Cal.Rptr.2d 696, 977 P.2d 693] (*Fukuda*).)

Against that background, Judge Warren analyzed each of the four tolling or exception provisions separately and concluded that the Commission had correctly determined that all four provisions applied. Specifically, Judge Warren first concluded that the Commission correctly found that the criminal investigation tolled the limitations period until April 4, 2003, as it had concluded that the " 'acts and omissions with which they are charges [*sic*] were the subject of a criminal investigation and prosecution within the meaning of Section 3304(d)(1).' " This determination, he found, "is both legally correct and not contrary to the weight of the evidence." Judge Warren then concluded that section 3304, subdivision (d)(4) extended the limitation provision, as the Commission had determined that the "number of officers involved, the myriad investigations conducted, the seriousness of the charges and the complexities of the case" made a three-month extension reasonable. He also concluded that "because of the factual similarities, the investigation of the named officers cannot reasonably be severed from investigation of the other officers," the Commission correctly applied the civil action tolling provision to all officers, and the charges were therefore timely. And based on the demonstrated need for coordinating the police department and district attorney investigations, Judge Warren concluded that the Commission "properly determined that the extension required for this coordination was reasonable." Finally, he held that the Commission's determination was not arbitrary or clearly erroneous.

Appellants filed timely notices of appeal, Lieutenant Parra on October 20, 2005, and the other appellants on November 1, 2005.

## II. DISCUSSION

### A. *The Standard of Review*

The fundamental standard of review here is substantial evidence (*Fukuda, supra,* 20 Cal.4th at p. 824), unless the appeal presents pure issues of law, in which case our review is independent. (*Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 204 [99 Cal.Rptr.2d 357]; *Stermer v. Board of Dental Examiners* (2002) 95 Cal.App.4th 128, 132–133 [115 Cal.Rptr.2d 294]; see *MHC Operating Limited Partnership v. City of San Jose* (2003) 106

Cal.App.4th 204, 219 [130 Cal.Rptr.2d 564] [hearing officer's interpretation of ordinance was subject to de novo review but "entitled to deference"].)

Applying the appropriate standard, we first conclude that section 3304, subdivision (d)(1) applies to the setting here, which tolls the limitation provision until the criminal indictments were dismissed. We further conclude that section 3304, subdivision (d)(4) also applies, which permits a reasonable extension of the limitation provision where the investigation involves more than one officer, and that substantial evidence supports that the extension here was reasonable. We thus conclude that Judge Warren properly denied the writ petitions, and we affirm.[9]

> B. *Section 3304(d)(1) Applies, Tolling the Limitation Provision During the Criminal Proceeding*

As quoted above, section 3304, subdivision (d)(1) provides that "[i]f the act, omission or other allegation of misconduct is also the subject of a criminal investigation or criminal prosecution, the time during which the criminal investigation or criminal prosecution is pending shall toll the one-year time period."

There was undisputedly a criminal investigation and a criminal prosecution, albeit one that was short-lived, as it was quickly dismissed as to all but the three off-duty officers. In light of this, five of the appellants conceded that, although the district attorney's prosecution included only Captain Corrales, Lieutenant Cota, and Sergeant Syme among the appellants, it tolled the limitation period as to all. These appellants thus conceded below, and concede here, that since the prosecution ended on April 4, 2003, the one-year limitation period began to run on that date and would expire on April 3, 2004.[10]

---

[9] Counsel for appellants asserted at oral argument that among the erroneous determinations by Judge Warren were that the tolling provision of section 3304, subdivision (d)(6) and the exception provisions in section 3304, subdivision (d)(3) applied, and thus the matter had to be remanded in light of such errors. As noted *post,* at footnote 14, we do not discuss either of these issues, other than to note that the former subdivision applies to Captain Corrales and Sergeant Syme. But even if Judge Warren's conclusions on these issues were erroneous, it would not matter, in light of the settled principle that "If the *decision* of the lower court is right, the judgment or order will be affirmed regardless of the correctness of the grounds upon which the court reached its conclusion." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 340, p. 382; see *Abouab v. City and County of San Francisco* (2006) 141 Cal.App.4th 643, 661 [46 Cal.Rptr.3d 206].)

[10] If a limitation provision is tolled, it means the period in which one is required to act is suspended, that is, it does not run during the tolling period. (*Schrader v. Scott* (1992) 8 Cal.App.4th 1679, 1684, fn. 1 [11 Cal.Rptr.2d 433] [" 'to suspend or stop temporarily' "].)

Lieutenant Parra, who, as noted, filed his own motion and petition below and his own briefs here (see fn. 8, *ante*), did not make the same concession.[11] Rather, Lieutenant Parra asserts that because he was not indicted, the criminal prosecution tolling provision does not apply to him. We disagree.

■ Section 3304, subdivision (d)(1) is straightforward, and is to be read in accordance with the "well-established" principles of statutory construction, most recently distilled in *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 199 [46 Cal.Rptr.3d 41, 138 P.3d 193]: "Our goal is to determine the Legislature's intent in enacting the statute ' "so that we may adopt the construction that best effectuates the purpose of the law." ' (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 625 [26 Cal.Rptr.3d 304, 108 P.3d 862].) In doing so, we look first to the statutory language, which generally is ' "the most reliable indicator of legislative intent." ' (*Ibid.*) Moreover, we give the words of the statute ' "their ordinary and usual meaning," ' construing them in their statutory context. (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818 [31 Cal.Rptr.3d 591, 115 P.3d 1233].)"

■ Section 3304, subdivision (d)(1) applies "[i]f the act, omission, or other allegation of misconduct is also the subject of a criminal investigation or criminal prosecution . . . ." Contrary to Lieutenant Parra's argument, it is the "act, omission, or other allegation" which must be the subject of the prosecution, and any objective reading of the record reflects that the criminal investigation encompassed the misconduct of all officers who were involved in connection with the incident—including Lieutenant Parra. In the words of the Commission: "the criminal investigation included all of the conduct, indeed the very allegations at issue in these administrative proceedings." We conclude that Judge Warren correctly concluded that the limitation period was tolled by the criminal investigation, the effect of which was that the one-year limitation period would not expire until April 3, 2004.

Since the charges were not filed until July 2004, the question then becomes whether another provision applies to extend the limitation period for an additional three-plus months, until July 22, 2004, when the charges were filed. In fact, the same issue is presented, though with a somewhat longer period, even if Lieutenant Parra were correct, and the criminal prosecution did not toll the limitation provision as to him. That issue is whether the limitation period is extended some eight months, from November 20, 2003

---

[11] Nor apparently did Inspector Falconer. Inspector Falconer asserts in his opening brief that he did not concede this issue, an assertion he makes without citation to the record. And Judge Warren's order notes that only Lieutenant Parra disputed this issue. On the other hand, Inspector Falconer's attorney argued that he did not concede the point, and the City's opposition to the writ petition apparently conceded as much.

(one year from the incident) to July 22, 2004, the date of the charges. We conclude that section 3304, subdivision (d)(4) extends the limitation period—whether the extension necessary is for three-plus months or eight.

C. *Section 3304, subdivision (d)(4) Applies as the Investigation Involved More Than One Officer*

■    Section 3304, subdivision (d)(4) provides an exception to the one-year limitation provision "[i]f the investigation involves more than one employee and requires a reasonable extension." As it is undisputed that the investigation involved "more than one employee," the issue is whether an extension was "reasonable" in light of all of the circumstances here. The Commission determined it was. Judge Warren agreed. And so do we.

The OCC's efforts in connection with its investigation are set forth in detail above. It cannot be gainsaid that those efforts were extensive, and included independent investigation by the OCC and also attempts, significant attempts, to obtain information from others. Those efforts ultimately produced the voluminous materials described above, review and digestion of which culminated in the OCC's 80-page report to Chief Fong.

But it did not come easily. Whatever the reasons or motivations of the other agencies, the fact is that the OCC did not obtain much of what it needed until December 2003, and perhaps later. OCC acted quickly, and with dispatch, interviewing numerous witnesses, including Appellants, and then digested all the material. And three and one-half months after the expiration of the tolled limitation period, and some eight months after expiration of any untolled one-year limitation provision, the OCC filed the charges in issue here. The Commission concluded that such extension, including one for eight months, was reasonable.[12] While Judge Warren addressed only the three-month extension, he concluded it was reasonable. We conclude that substantial evidence supports that the extension here was reasonable.

Essentially ignoring the complexity of the circumstances as determined by the Commission and Judge Warren, Appellants focus primarily on the passage of time. Reading the record in a fashion favorable to them, Appellants argue in the joint brief as follows: "In conducting its investigation, the OCC interviewed forty-two individuals from 2002 through 2004. (Clerk's Transcript, Vol. 4, 888.) Nineteen of those interviews were summarized by the OCC and included in a section of their Sustained Case Report entitled

---

[12] As quoted above, the Commission expressly concluded that "[a]n extension of eight months beyond the twelve-month statutory period is reasonable in a multiple-officer case of this complexity. But an extension of eight months is not necessary to a finding that the service of the charges here was timely."

Summary of Evidence. Seven of those nineteen interviews were completed by the close of 2003. Although the remaining twelve interviews were not conducted until early 2004, ten of those individuals had provided comprehensive testimony to the grand jury, the transcripts of which were available to the OCC as early as January 28, 2003. A comparison of the information obtained from those interviewed in 2004 with their grand jury testimony further corroborates that the OCC acquired no new facts necessary to its investigation. [¶] Thus, in 2004, the only information that was conceivably new to the OCC was from the interviews of Officer Ryan Seto and Deputy Chief Greg Suhr. As seen by reviewing their interviews, neither officer shed any new light on the investigation or provided the OCC with facts of which it was not already aware."

Lieutenant Parra who, as noted, filed his own papers throughout, makes the most individually fact-intensive argument. He argues essentially that his name was mentioned in Buckley's November 24, 2002 citizen's complaint; that he was interviewed by the general works division on December 4, 2002; and that he testified at the grand jury on January 30, 2003. Parra further asserts that his name did not appear in OCC's investigation chronology until February 9, 2004.[13] So, his argument apparently runs, the OCC could easily have investigated his involvement, and any charges against him easily filed within one year. We are not persuaded.

It is perhaps enough to note that the recitation of the record in both appellants' briefs is contrary to the rule that the evidence is to be viewed in the light most favorable to the prevailing party below. (See *Moran v. Board of Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20]; *Jaramillo v. State Bd. for Geologists & Geophysicists* (2006) 136 Cal.App.4th 880, 889 [39 Cal.Rptr.3d 170]; see generally 9 Witkin, Cal. Proc., *supra*, Appeal §§ 378–380, pp. 428–432.) But there is much more.

The record demonstrates that it was not until December 2003 that the police department was at all forthcoming, and even then some material evidence was not obtained by OCC until 2004. And until it all was analyzed, and put in the context of the other evidence, how could the OCC reasonably close its investigation? The potential misconduct, wide-ranging as it was, could not be investigated in isolation, especially as the issues in question involved how and when various officers in the department acted, or failed to

---

[13] In his opening brief Lieutenant Parra observes that "The Commission's Statement of Decision is remarkable in that both its title and its preamble on (page 1) omit any reference to Parra. (CT at 994 & 995.)" While such omission is not explained in the record, we observe that Lieutenant Parra had filed his own motion to dismiss with the Commission, and the other officers their own joint motion. But whatever the reason, Lieutenant Parra can hardly claim any benefit from this omission, as he was a participant at the Commission proceedings, and certainly knew its decision adversely affected him, as shown by his writ petition.

act, in response to that investigation. For the OCC to determine which officer should have taken action and when, and whether he acted appropriately or inappropriately, it must have a full picture of the entirety of events. That full investigation led to the charges here to be sure. It also led, it bears noting, to five of the officers being cleared. In sum, we would assume that the officers would expect no less than the investigation conducted here—and certainly not disciplinary charges filed without a full investigation.

Moreover, the investigation did not merely involve "more than one employee" in the simple sense of two or three officers. It involved numerous officers, included among whom at one point was the chief of police, his assistant, various deputy chiefs, and many other ranking officers. It involved captains, lieutenants, lieutenants supervising sergeants, sergeants supervising line officers, and line officers themselves. The integrity of the San Francisco Police Department, top to bottom, was in focus here, providing abundant evidence supporting an extension of the limitation provision.

The succinct conclusion of the Commission following its lengthy hearing merits reiteration: "the scope and nature of [OCC's] investigation were unprecedented. The OCC investigated 28 allegations against 12 members of the Department, including members of the command staff. The OCC was required to collect and analyze data resulting from its own efforts, and to consider as well materials provided as a result of the Department's criminal investigation, the District Attorney's criminal investigation, and the Department's administrative investigation. The OCC reviewed more than 7,000 pages of material, analyzing it for relevancy, consistency and evidentiary value. The OCC also interviewed 42 people, and compared many of those statements to statements given by the same witnesses in the context of the other investigations."

Indeed, the complexity of the setting here, and the difficulties presented to the OCC, was acknowledged by one appellant's counsel at the hearing before the Commission, where he admitted "[t]his case was huge in scope." And two pages later he admitted that he was "not saying that the OCC . . . cannot conduct its own investigation nor . . . that they did not encounter obstacles, significant ones." Such admission says it all.

■ It is true, as Lieutenant Parra asserts, that the Act applies to him individually. (See *White v. County of Sacramento, supra*, 31 Cal.3d 676, 681.) It is also true that Lieutenant Parra and the other appellants had the right to "fair treatment." That said, the public had—and has—the concomitant right in maintaining the integrity of the police department. (See *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 569 [273 Cal.Rptr. 584, 797 P.2d 608].) And this necessarily includes "assurance to the public

that the OCC's investigation is neutral. As one commentator has noted: 'it is the attitude of the public toward the police discipline system that will determine the effectiveness of the system as an element of police-community relations. A system can be theoretically sound and objective in practice but if it is not respected by the public, cooperation between the police and the public can suffer.' (Brent, *Redress of Alleged Police Misconduct: A New Approach to Citizen Complaints and Police Disciplinary Procedures* (1977) 11 U.S.F. L.Rev. 587, 607–608.)" (*S.F. Police Officers' Assn., supra,* 202 Cal.App.3d at p. 191.)

That policy, it appears, is what generated Buckley's citizen's complaint in the first place. And that policy was recognized early on by the OCC as well, manifest by its March 19, 2003 letter which confirmed that the "public demands a timely and unbiased investigation . . . . The City Charter mandates that the OCC conduct [it]. . . . While steadfast and aggressive in its attempt to investigate . . . the OCC is severely hampered . . . by the non-cooperation of the [police department] and the District Attorney . . . ." The conclusion we reach, we are satisfied, is consistent with all the purposes of the Act, and will allow the charges to proceed to a determination on the merits.[14]

We close with the observation that our conclusion to allow the disciplinary charges to proceed is fully consistent with the policy behind statutes of limitation, which the United States Supreme Court long ago noted is to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." (*Telegraphers v. Ry. Express Agency* (1944) 321 U.S. 342, 348–349 [88 L.Ed. 788, 64 S.Ct. 582]; accord, *Cutujian v. Benedict Hills Estates Assn.* (1996) 41 Cal.App.4th 1379, 1387 [49 Cal.Rptr.2d 166].) No claim slumbered here. No evidence was lost. No witnesses disappeared. Not by a long shot.

---

[14] We note that the tolling provision of section 3304, subdivision (d)(6) also expressly applies to Captain Corrales and Sergeant Syme. That section provides that "[i]f the investigation involves a matter in civil litigation where the public safety officer is named as a party defendant, the one-year time period shall be tolled while that civil action is pending." Captain Corrales and Sergeant Syme were named as defendants in the civil action, which civil action was still pending at the time the disciplinary charges were filed.

Because of the conclusion we reach, we need not consider whether section 3304, subdivision (d)(6) applies to all Appellants, nor whether section 3304, subdivision (d)(3), the multijurisdictional exception, applies at all. We leave these issues for another day.

## III.  DISPOSITION

The order denying the petitions for administrative mandamus is affirmed.

Haerle, Acting P. J., and Lambden, J., concurred.

A petition for a rehearing was denied November 30, 2006, and the opinion was modified to read as printed above. The petition of appellant Henry Parra for review by the Supreme Court was denied February 21, 2007, S149041.