[No. A133300. First Dist., Div. Two. Feb. 13, 2013.]

MARVETIA LYNN RICHARDSON, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO POLICE COMMISSION,
Defendant and Respondent;
CITY AND COUNTY OF SAN FRANCISCO et al., Real Parties in Interest
and Respondents.

COUNSEL

Dolan Law Firm, Christopher B. Dolan and Quinton B. Cutlip for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, Jonathan Givner, Andrew Shen and Christine Van Aken, Deputy City Attorneys, for Defendant and Respondent and for Real Parties in Interest and Respondents.

OPINION

RICHMAN, J.—After 16 years as a member of the San Francisco police force, Inspector Marvetia Lynn Richardson was terminated by the San Francisco Police Commission (Commission) for misconduct arising out of three separate incidents. Richardson filed a petition for writ of administrative mandamus in the San Francisco Superior Court seeking reinstatement, back-pay, and damages. The court affirmed the Commission's decision in all regards. Richardson appeals, asserting numerous challenges to the court's order denying her petition. We affirm.

## FACTUAL BACKGROUND

*Unauthorized CLETS[1] Transactions*

In February 2007, Dwayne Jackson[2] filed a complaint with the San Francisco Office of Citizen Complaints (OCC), alleging that Richardson had obtained confidential information on him and his wife through improper computer searches. The matter was referred to the San Francisco Police

---

[1] CLETS—the California Law Enforcement Telecommunications System—is a confidential law enforcement database that allows police officers to access an individual's criminal history, as well as driver's license and vehicle registration information.

[2] Jackson's first name appears in the record as both Dwayne and Duane.

Department's (SFPD) management control division (MCD), which conducted an investigation and discovered that between January 1, 2006, and March 2007, Richardson had run 48 unauthorized searches on the SFPD's CLETS computer system. The subjects of her searches were Samonia Nelson (her girlfriend), Jackson (Nelson's ex-boyfriend), and Orlandis Caleb (Nelson's ex-husband).

On March 15, 2007, MCD forwarded the matter to the SFPD's special investigations division (SID),[3] which received the file on March 22, 2007.

On May 7, 2007, Lieutenant Daniel J. Mahoney of SID returned the file to MCD with a memorandum advising: "This incident involves computer queries made by Inspector Richardson regarding Duane Jackson. An anonymous letter was sent to Mr. Jackson's wife (Mrs. Dee Jackson) in Antioch. [¶] Currently, Insp. Richardson is under investigation by Antioch Police Department for allegations of theft by check fraud and it was believed that the unauthorized computer usage was linked. After conferring with Antioch PD, it is apparent that the two cases are not linked and are separate incidents. [¶] At this time, SID is not conducting an investigation into the unauthorized computer usage as a criminal violation." The memorandum concluded: "There is no criminal investigation being conducted on the matter of unauthorized computer usage by Insp. Marvetia L. Richardson #1246. This case is being sent back to Management Control Unit for administrative action."

On August 9, 2007, Richardson was interviewed by investigators from MCD. She admitted conducting the improper searches, offering excuses for having done so, but denied having divulged confidential information obtained during the searches.

On January 8, 2008, Lieutenant Lynette A. Hogue, commanding officer of MCD, sent a memorandum to then Chief of the SFPD Heather Fong. Concerning the SID evaluation of the complaint, the memorandum summarized: "On March 22, 2007, the Special Investigations Unit received and reviewed the information contained in the OCC complaint and determined that they would not conduct a criminal investigation at this time. On May 7, 2007, the Special Investigative [sic] Division referred the complaint back to Management Control Division with their recommendation."

---

[3] MCD investigates allegations of police misconduct for violations of the SFPD's general orders governing officer conduct. SID is a separate unit responsible for investigating and prosecuting potential criminal conduct by police officers.

## The Check Fraud Charges

Shortly after the improper CLETS transactions came to light, Richardson was the subject of another investigation, this one of a serious criminal nature involving multiple police jurisdictions.

As will be discussed in greater detail below, Richardson owned a home in Antioch, part of which she rented to a tenant, Bridget Reed. Reed was involved in a relationship—the nature of which was described variously by different witnesses—with a young man named Jason Metz.[4] According to Metz, Reed persuaded him to steal checks from the checkbooks of both his mother and father, who owned a real estate business in Antioch, and forge their signatures. Metz then gave the checks to Richardson, who deposited the checks into her checking account, giving Metz and Reed some cash back and keeping the rest for herself. The checks were in the following amounts, with the following descriptions noted on the memoranda lines: $800 for "rent," $6,500 for "trip for Bridgette birthday/deposit," $3,100.50 for "rent/deposit," $6,400 for "school/tuition," $4,500 for "car repair," $4,250 for "promise ring for Bridgette," and $4,500 for "car purchase."

In late March 2007, Metz's parents discovered that unauthorized checks totaling over $28,000 had been written on their accounts. Of that amount, all but $1,000 or $2,000 had been written to Richardson. Richardson's checking account was subsequently frozen due to suspected check fraud.

Richardson would later testify that Metz told her he worked for his parents' real estate company and that he had authority to write the checks. According to Richardson, Metz would give her a check with the understanding that she would cash it and give Reed the cash, keeping some for herself to cover rent and a deposit that Reed owed her. Despite that she was an inspector in the SFPD's fraud unit, Richardson claimed she never suspected Metz did not have the authority to write the checks.

The check fraud allegations against Richardson came to the attention of the SFPD by April 9, 2007. At that time, the Antioch Police Department (Antioch PD) was conducting an investigation, which lasted until May 2007, when the investigation was turned over to the Brentwood Police Department (Brentwood PD).

On September 14, 2007, Brentwood Police Detective M. Estrada prepared a report in which he recommended that the "case be forwarded to the District

---

[4] Metz, though 32 years old at the time, had a diminished mental capacity, was easily influenced and manipulated, and was incapable of handling his own finances.

Attorney's Office for review and issuance of a complaint against the three responsibles . . . ." As to Richardson in particular, Detective Estrada recommended charging her with seven counts of grand theft and seven counts of fraud. The report originally indicated that the case was "Closed," although a subsequent handwritten notation indicated that on November 1, 2007, it was reopened for followup investigation into the original checks for forgery evaluation.

On December 18, 2007, Detective Estrada prepared a supplemental report advising that he was unable to obtain the original checks. As such, his ability to evaluate the checks for forgery was limited. The report identified the case status as "Closed."

On December 16, 2008, the Brentwood PD faxed a document titled "Request for Prosecution" to Lieutenant Rob O'Sullivan of the SFPD. It advised that prosecution of Richardson for the check fraud was declined due to "Insufficient Evidence." A Contra Costa County deputy district attorney had signed the document the previous day. The accompanying fax cover sheet noted, "Per your request."

*The Antioch Incident*

Shortly after 1:00 a.m. on the morning of June 7, 2007, Antioch police dispatch broadcast a call regarding a disturbance at a residence in Antioch. The residence was a five-bedroom home owned by Richardson, who rented the three upstairs bedrooms to Bridget Reed and her three children. That night, Richardson had numerous houseguests—three adults, two teenagers, and two young children—all of whom were planning to go to Six Flags Discovery Kingdom the following day. Samonia Nelson—Richardson's girl-friend and one of the subjects of her improper CLETS searches—was one of the houseguests.

Antioch Police Officers Jason Vanderpool and Santiago Martinez re-sponded to the call.[5] When they arrived at Richardson's house, the officers could hear a "verbal argument between people" and "screaming" emanating from the house. They knocked on the front door, and Nelson opened it, allowing them to come inside. When they entered, they saw Reed, who had recently been served an eviction notice by Richardson, walking down the stairs. She told the officers that Richardson's houseguests were being loud, which was making it hard for her daughter to fall asleep. Her requests that they quiet down had been ignored, and she feared it was going to turn violent.

---

[5] Vanderpool testified at the Commission's evidentiary hearing, while Martinez was on disability leave and did not testify.

At Martinez's request, Nelson went to get Richardson, who entered the living room from the downstairs master bedroom. Vanderpool described Richardson as "agitated" that they "were inside of her house." According to Vanderpool, when Richardson told Martinez that she was the homeowner, he responded that she wished she owned the home.[6] A brief conversation ensued and, according to Vanderpool, Richardson "was just uncooperative with us. And we were explaining why we were there and she said something to the fact that remember I do the same thing that you do and called [Martinez] a broke ass security" in a tone that Vanderpool considered "assertive."

Vanderpool testified that as he and Martinez were leaving, Martinez told Richardson that she "set a great example for [her] agency." Richardson responded by telling him to "fuck off" and slamming the door behind them.[7]

Not surprisingly, Richardson's version of the events painted a much more favorable portrait of her behavior. She testified that when she came into the living room, she asked the officers what was going on. Martinez asked if she was the homeowner, and when she answered that she was, he retorted that she wished that she was.[8] When Richardson explained to Martinez that she was evicting Reed, he responded, "I don't care. If I have to come back, everybody is going to be arrested . . . for disturbance of the peace." Richardson replied, "[D]on't forget [that] I do the same thing you do, Officer Martinez, you don't have to threaten me with the Penal Code. I've been telling you what's going on and you're questioning me about homeowner-ship. Totally out of bounds here." Martinez told her, "[W]ell, if I got to come back, I'm going to arrest you. You're fired anyway. You're not even a cop. You're fired. You're fired. You're an alleged homeowner." Richardson re-sponded, "I [can] see this conversation is not going to go anywhere. You're very unprofessional. You're acting like a security guard. Please leave my home and come back with a warrant and your sergeant." She then escorted the officers to the door and closed it behind them. After that, she told her guests to settle down and go to bed, and she went into her bedroom, shut the door, and went to sleep. She denied ever calling Martinez "broke ass security," swearing at any officer, or slamming the door behind them.

After they left the house, the officers walked back to their patrol cars, discussing what had happened. As they were talking, they "heard some more screaming upstairs, sounded like someone may have been slammed into the wall and heard a female voice scream to call the police." Because they could

---

[6] The implication being that Richardson, a Black woman, would not own a five-bedroom home in a nice Antioch neighborhood.

[7] Vanderpool acknowledged that his police report failed to mention anything about Richardson being uncooperative, calling Martinez "broke ass security," or swearing when she slammed the door.

[8] Nolan Satterfield, one of Richardson's houseguests, also testified that Martinez questioned Richardson's ownership of the house, called her names, and was rude to her.

hear some kind of physical altercation, they requested backup. While they were waiting for additional units to arrive, Reed and her daughter ran out of the house. As Vanderpool described it, "They were shaking. Her daughter was very upset. She might have even been crying." Reed told the officers that someone inside the house threatened to kill them and they were afraid to go back inside.

Within minutes, Officer Jason Joannindes and Sergeant Tom Fuhrmann arrived. They found Martinez and Vanderpool standing in front of the house, speaking with Reed and her daughter. With four officers now there, they returned to the house. From the time they left the house following the first visit and approached the house the second time, approximately 15 minutes had elapsed.

While Joannindes walked back and forth watching the house, Vanderpool, Martinez, and Fuhrmann approached the front door, knocked very loudly several times, and rang the doorbell multiple times, repeatedly announcing that they were from the Antioch PD. Through the closed door, they could hear someone inside whispering, "If you don't answer the door, they'll go away." They also requested that dispatch attempt to call the residence, but dispatch was apparently unable to find a phone number. Their efforts to contact someone inside lasted "well over five minutes" in Vanderpool's estimation and "[s]omewhere between 10 and 15 minutes" in Fuhrmann's estimation.

Twenty-two minutes after he arrived on the scene, Fuhrmann authorized forced entry, and Vanderpool kicked the front door open, a process that took a couple of minutes and caused significant damage to the door. The officers entered the house and announced their presence. Vanderpool had his gun in "low ready position," and Fuhrmann also had his weapon drawn. As they walked into the house, calling for people to come out, two small children, whom Fuhrmann described as "Just little things. Little tykes. They were quite upset and shaken," came down from upstairs. After the children were seated in the living room, Nolan Satterfield, an adult male who had been sleeping on a couch in the family room, walked in and put his hands up. In a downstairs bedroom, they found two teenagers who were, by Vanderpool's testimony, "acting as if they were asleep in the bed." They were detained in handcuffs and turned over to Joannindes.

Vanderpool, Martinez, and Fuhrmann then approached the master bedroom, Martinez carrying a Taser in his hand and the other two carrying their service weapons. The bedroom's French doors were closed, and they very loudly announced, "Antioch PD, open the door," several times. Eventually, Richardson opened one of the doors, although she stood partially behind the door, with her right side, including her right hand, obscured and only the left side of her body visible to the officers. According to Vanderpool, they were aware that Richardson was a police officer and were concerned that she was concealing a firearm behind the door.

Richardson was instructed multiple times to come out of her bedroom and show her hands. Fuhrmann asked Richardson where the dogs were, and she responded, "Out in the back." Because she was still not showing her hands, he reached in and grabbed her by the crook of her left elbow, trying to pull her away from the door. He yanked her out of the room enough that her right hand was visible, and they could see that she did not have a gun in it. Richardson reacted by pulling away from him and moving back into the bedroom. Martinez then activated his Taser, striking Richardson on the left side of her body.

A digital recorder that Martinez was carrying in his pocket captured the following exchange:

"OFFICER: Come on out. Come on out.

"OFFICER: Come on out.

"RICHARDSON: Why you guys here?

"MARTINEZ: Come here.

"OFFICER: Come on out. Now.

"MARTINEZ: Let me see your hands.

"RICHARDSON: [Unintelligible—sounds like *have to*—]

"MARTINEZ: Let me see the other hand. Let me see the other hand.

"OFFICER: Ma'am, you're going to get tazed. Come on out. Now.

"OFFICER: Come on. Come on.

"RICHARDSON: Samonia, wake up.

"OFFICER: Where's the [unintelligible—sounds like *dogs at*]?

"RICHARDSON: Out in the back. What's going on?

"OFFICER: [Unintelligible—sounds like *Wake up*.] Go. Now.

[Taser firing sound; electrical pulses.]

"RICHARDSON: [Screaming sound.]

"OFFICER: Get up.

"RICHARDSON: Aw, you did that on purpose, dude.

"OFFICER: [Unintelligible.]

"MARTINEZ: Turn around. Turn around. Turn around. Turn around.

"OFFICER: Get on your stomach.

"RICHARDSON: How do you justify that?

"OFFICER: Show us your hands. That's all you gotta do.

"RICHARDSON: I did. You know I'm not armed. [Unintelligible—sounds like *Samonia*].

"FEMALE: What?

"RICHARDSON: Call my attorney. Tell him they tazed me. I'm unarmed. I'm in my pajamas."

According to Vanderpool, Richardson was then helped off the ground and, in handcuffs, moved to the dining room. Fuhrmann made the decision to cite Richardson for resisting arrest. Vanderpool prepared the citation and requested that Richardson sign it, which would have allowed her to remain in the house. Rather than sign it, however, Richardson attempted to write "tased" on it. The officer told her not to, instructing her only to sign her name on the signature line. Again, she attempted to write "tased." Richardson was then taken into custody.

Again, Richardson described the incident differently. She testified that she was asleep when she heard some "beeping sounds." She opened her bedroom door and "with a clear unobstructed view [saw] Sergeant Fuhrmann, Martinez, and Vanderpool standing in very close proximity next to each [other] pointing gun[s] and tasers at me." As she described it, "I was standing in the doorway clearly on the wood portion or the wood frame, exposing my hands, head and body." She was "very groggy," "[s]leepy and dazed," and she heard the officers shout "all kind[s] of things" at her. Fuhrmann asked where the dogs were, and she responded that they were in the backyard. She vehemently denied that her hand was hidden behind the door, explaining that as a police officer, she was very aware of officer safety issues and would not have put Nelson and her daughter, who were still asleep in the bed, in harm's way by trying to hide behind the door.

After Richardson responded to the dog inquiry, Fuhrmann suddenly grabbed her left arm and pulled her towards him, and Martinez fired his Taser at her. As she described it: "I fell to the ground. I started shaking. I felt volts of electricity going through me. I felt urination running down my leg and I fell to the ground. I said, oh, dude, you did that on purpose. How you going to justify that, Martinez? How you going to justify that?"

According to Richardson, Vanderpool then handcuffed her while she was still on the ground, yanked her up off the floor, and walked her into the dining room. He wrote a citation for resisting arrest and then asked her to sign it. When she attempted to write "tasered" on it, he told her she could not do that and to just sign the citation. After she again attempted to write "tasered," he took it away, telling her she was going to go to jail. Richardson testified that she would have signed the citation had he permitted her to write "tasered" on it. At Richardson's request, an ambulance was called so she could be taken for a medical evaluation because she was concerned for her health: "I urinated on myself. I was despondent. I was shaken up. I was a wreck."

When asked at the evidentiary hearing why she did not respond to the commands to show her hands, Richardson explained, "Three officers were talking to me at the same time. Show me your hands. It was all confusing. I'm asleep. It all happened so quickly. I couldn't concentrate on one particular officer at that particular one point in time aside from Sergeant Fuhrmann."

A complaint filed June 13, 2007, by the Contra Costa District Attorney charged Richardson with harboring felons (Pen. Code, § 32) and obstructing a police officer (Pen. Code, § 148, subd. (a)(1)), while others in the house, including Nelson, were brought up on additional charges.[9]

On August 6, 2007, Sergeant Jennifer Dorantes of MCD interviewed Richardson regarding the events of June 7. According to Dorantes, during the interview, Richardson was evasive in her answers and told her that the Antioch police officers never issued any commands or a warning that she was going to be "Tased." According to Richardson, however, she advised Dorantes that she did not *recall* the officers issuing any commands or warnings.

---

[9] In a federal civil rights action against the City of Antioch, the Antioch PD, and the officers involved in the incident, the court found that the second entry into Richardson's home constituted an illegal search in violation of the Fourth Amendment. (*Richardson v. City of Antioch* (2010) 722 F.Supp.2d 1133, 1143.) All charges against Richardson, Nelson, and others were subsequently dismissed.

## PROCEDURAL BACKGROUND

*The Complaints*

On June 14, 2007, the SFPD filed a complaint (case No. ALW C07-076) with the Commission. It contained one specification that related to the Antioch incident, charging Richardson with "Resisting, delaying or obstructing an officer in the discharge or attempt to discharge any duty of his or her office or employment, conduct which undermines the good order, efficiency and discipline of the Department and which brings discredit on the Department . . . ."

A first amended complaint followed on March 13, 2008, this one containing nine specifications. Specifications Nos. 2 through 4 involved the Antioch incident.[10] No. 2 echoed the allegations of specification No. 1 in the original complaint. No. 3 alleged that Richardson engaged in "Unofficer like conduct toward the Antioch Police Department which reflects discredit upon the Department . . . ." And No. 4 charged Richardson with "Making statements that are not truthful during the MCD interview, when Members are required to answer all questions truthfully and without evasion . . . ."

Specifications Nos. 6 through 9 involved the CLETS transactions. Nos. 6, 7, and 8 charged Richardson with "Bringing discredit on the Department [by using her] position as member of Department to obtain confidential information . . . through unauthorized CLETS transactions," one specification pertaining to each of the three victims of her CLETS searches. No. 9 alleged that Richardson divulged confidential information obtained during those improper transactions.

On February 19, 2009, the SFPD filed new disciplinary charges against Richardson (case No. ALW C09-004), these arising out of the check fraud incident. The two specifications charged her with "Conduct Unbecoming an Officer, conduct which undermines the good order, efficiency and discipline of the Department and which brings discredit on the Department . . . ."

*Richardson's Attempts to Dismiss the CLETS and Check Fraud Charges*

On April 8, 2009, Richardson filed a lawsuit in the San Francisco Superior Court against the City and County of San Francisco, the SFPD, and then Chief of Police Heather Fong, seeking to enjoin them from pursuing the CLETS and check fraud allegations on the ground that the charges were

---

[10] Specifications Nos. 1 and 5 involved other alleged misconduct by Richardson. The Commission did not sustain those specifications, and they are not at issue here.

barred by the statute of limitations. (Case No. 487077.) First amended and second amended complaints followed.

On June 25, 2009, Richardson filed an unsuccessful ex parte application in her civil action for a temporary restraining order to preclude the SFPD from pursuing the allegedly time-barred specifications. That same day, she filed with the Commission a "Motion to Exclude All Evidence and Dismiss All Charges Related to Allegations That Are Barred by the Statute of Limitations." Again, the motion sought dismissal of the CLETS and check fraud specifications on statute of limitations grounds.

*The Evidentiary Hearing*

An evidentiary hearing on the specifications against Richardson commenced on July 8, 2009, before Police Commissioner David Onek, the designated hearing officer. At the outset of the hearing, Richardson moved to exclude all evidence of what happened during the Antioch PD's second entry into her home. The Commission denied the motion without prejudice on the ground that it had not yet heard evidence on the circumstances surrounding the entry.

Commissioner Onek then took evidence over the course of eight days in July. Sworn testimony and documentary evidence was presented by both parties. The SFPD presented testimony from Officer Vanderpool, Sergeant Fuhrmann, Sergeant Dorantes, Lieutenant Kenwade Lee, Sergeant Paget Mitchell, Sergeant Steven Ford, Lieutenant Edward Santos, Jason Metz, Gayle Metz, Wayne Metz, and Lieutenant Robert O'Sullivan. Richardson testified on her own behalf, and also called as witnesses Officer Sylvia David, Samonia Nelson, Nolan Satterfield, Betty Marsden, and Sergeant Ronald Reynolds. During the hearing, Richardson admitted three of the specifications (Nos. 6, 7, and 8 involving the CLETS transactions).

Also during the evidentiary hearing, counsel for Richardson, Quinton Cutlip, expressed concern that the city attorney's office had a conflict of interest because it was advising the Commission in the case against Richardson, while at the same time representing the SFPD in Richardson's civil case. Commissioner Onek responded to this concern by saying, ". . . I understand your concern, Mr. Cutlip. There is a wall between different parts of the City Attorney's office when they have potential conflicts like this." When pressed by Mr. Cutlip for "some kind of documentation of this wall," the Commissioner declined the request, explaining, "[T]his is not the venue for this concern. . . ." Mr. Cutlip persisted, asking that the Commission recuse itself from the case, which request Commissioner Onek denied.

On July 14, 2009, in the midst of the evidentiary hearing, Richardson moved for nonsuit on the specifications arising out of the Antioch incident.

As to specifications Nos. 2 and 3, Richardson argued that she could not be found guilty of the Antioch-related charges because the Antioch PD's entry into her house was unconstitutional and she could not be punished for peaceful resistance to the officers' unlawful conduct. As to specification No. 4, she contended that the evidence presented by the SFPD, specifically the testimony of Dorantes, who conducted the MCD interview, demonstrated that she never made false statements during the interview. She also renewed her motion to exclude evidence regarding the Antioch incident.

*The Commission's Rulings*

On November 4, 2009, the Commission denied Richardson's June 25 motion to dismiss the CLETS and check fraud allegations on statute of limitations grounds.

On December 9, 2009, the full Commission considered the record of the evidentiary hearing. Following deliberations, it sustained specifications Nos. 2 and 3 (the Antioch incident) and 6 through 8 (the unauthorized CLETS searches) in case No. ALW C07-076, and specifications Nos. 1 and 2 (the check fraud scheme) in case No. ALW C09-004. Following argument from counsel for the parties in the subsequent penalty phase, the full Commission again deliberated and unanimously voted to terminate Richardson from employment with the SFPD. In announcing its decision, it stated that the check fraud charges alone warranted termination. The Commission's decision was adopted a week later in resolution No. 126-09, which ordered that Richardson be terminated effective immediately.

Also on December 9, the Commission issued a decision denying Richardson's July 14, 2009 motion for a nonsuit. Richardson's motion to exclude evidence of what transpired during the Antioch incident was likewise denied.

On June 2, 2010, the Commission adopted three additional resolutions. Resolution No. 61-10 adopted findings of fact and conclusions of law supporting the Commission's November 4, 2009 decision denying Richardson's motion to dismiss the allegedly time-barred specifications. As to the CLETS charges, it stated:

"A. The Commission finds that the one-year Government Code §3304(d) statute of limitations for notifying an officer of proposed discipline was tolled for 53 days as to these CLETS charges, during the Special Investigations Division (SID) investigation of the allegations as possible crimes. (Government Code §3304(d)(2).)

"On February 21, 2007 an Office of Citizen's Complaints (OCC) investigator's letter first notified Management Control Division (MCD) of possible

CLETS violations by Inspector Richardson. MCD investigates possible administrative disciplinary charges against officers. On March 15, 2007, MCD referred the matter to the Special Investigations Division for investigation as possible crimes. The statutory time for bringing disciplinary charges was tolled during that SID investigation of possible crimes, pursuant to Government Code §3304(d)(1). On May 7, 2007 SID returned the matter to MCD for follow-up as an administrative disciplinary (not criminal) matter. Fifty-three (53) days had elapsed during that Government Code §3304(d)(2) tolling period, while the matter was being investigated by SID.

"B. The Commission finds that the Specifications 6, 7, 8 and 9 allegations of CLETS violations are not time-barred by the Government Code §3304(d) one-year statute of limitations as argued in Inspector Richardson's Motion to Dismiss, since Inspector Richardson was served March 13, 2008 with notice of proposed discipline on these charges, which was within one year plus 53 (tolled) days after the February 21, 2007 notice to the Department of possible CLETS violations."

Concerning the check fraud charges, the resolution provided:

"A. The Commission finds that the one-year Government Code §3304(d) statute of limitations for notifying an officer of proposed discipline was continually tolled as to these fraudulent check charges until December 16, [2008], during investigation as possible crimes by two other police departments and during the time the District Attorney considered criminal charges. (Government Code §3304(d)(2).)

"(i) The Antioch Police Department investigated during April and May 2007. In April 2007 the San Francisco Police Department learned of the Antioch investigation. Inspector Richardson does not dispute that time was continuously tolled during the Antioch Police Department Investigation.

"(ii) The Antioch investigation led to further investigation by the Brentwood Police Department during May and June 2007, which further continuously tolled the time. Inspector Richardson does not dispute that time was continuously tolled during this time period as well.

"(iii) Brentwood Police Department referred the matter to the Contra Costa District Attorney for possible criminal prosecution. On December 15, 2008 the District Attorney declined to prosecute, and so notified the Brentwood Police Department on December 16, 2008.

"(iv) The Commission finds that the Government Code §3304(d) one-year time period for notifying Inspector Richardson of proposed discipline on the

fraudulent check charges was continuously tolled from April 2007 when the San Francisco Police Department first learned of the Antioch Police Department investigation, until the District Attorney completed its part of the process in December 2008. (Government Code §3304(d)(2).)

"B. The Commission finds that the Case No. C09-004 (Specifications 1 and 2) allegations of check fraud violations are not time-barred by the Government Code §3304(d) one-year statute of limitations as argued in Inspector Richardson's Motion to Dismiss, since Inspector Richardson was served February 18, 2009 with notice of proposed discipline on these charges, which was well within one year after the continuous tolling period ended on December 18, 2008."

The second resolution, No. 62-10, adopted the Commission's findings and conclusions supporting the December 9, 2009 decision sustaining the specifications concerning the Antioch incident, the CLETS transactions, and the check fraud incident. As pertinent here, in support of the Antioch charges the Commission found that "Inspector Richardson delayed and obstructed members of the Antioch Police Department in the discharge and attempted discharge of their duties when she refused their order to show both hands, which reflected discredit on the San Francisco Police Department." As to the CLETS charges, the Commission found that Richardson admitted the allegations of conducting the improper computer searches. Lastly, concerning the check fraud, the Commission found that Richardson's testimony was not credible and that she engaged in conduct unbecoming an officer when she deposited numerous checks belonging to Wayne and Gayle Metz without their permission.

Finally, resolution No. 63-10 adopted the Commission's findings and conclusions supporting its December 9, 2009 decision denying Richardson's motion for nonsuit.

*Petition for Writ of Administrative Mandamus*

On March 8, 2010, Richardson filed a petition for writ of administrative mandamus in the San Francisco Superior Court. The petition, filed against the Commission, identified as real parties in interest the City and County of San Francisco, the SFPD, Police Chief George Gascon, and former Police Chief Heather Fong.

The petition challenged the Commission's decision sustaining the specifications against Richardson. As to the specifications pertaining to the Antioch incident, Richardson argued that the decision was invalid for multiple reasons: the Commission improperly excluded a memorandum prepared by

Sergeant Fuhrmann regarding the forced entry into Richardson's home; it improperly considered evidence of what happened after the police illegally entered her home in violation of the Fourth Amendment; it abused its discretion because its findings were not supported by the evidence; and the penalty was excessive as a matter of law.

As to the CLETS and check charges, Richardson claimed they were barred by the statute of limitations, and the decisions regarding those specifications were not supported by the evidence. As to the CLETS charges, she contended the penalty was excessive as a matter of law.

The petition also alleged that the Commission had a conflict of interest. According to the petition, during the July 2009 hearing, Commissioner Onek consulted with the city attorney's office on a variety of matters, and an attorney from the city attorney's office was present during the December 9, 2009 hearing before the full Commission. At the same time, the city attorney's office was representing the City and County of San Francisco and the SFPD in Richardson's civil lawsuit. This, Richardson contended, deprived her of a fair trial.

Richardson prayed for a peremptory writ of mandate directing the Commission to set aside its decisions of November 4 and December 9, 2009, and reinstate her with backpay. She also sought damages in the form of lost wages and benefits, compensation for the damage to her reputation, and attorney fees.

After respondents answered, the matter was assigned to the Hon. Ronald E. Quidachay for all purposes. Judge Quidachay set a briefing schedule for the motion for peremptory writ, with the motion to be heard July 11, 2011.

On April 25, 2011, Richardson filed her notice of motion and motion for peremptory writ of administrative mandamus, reiterating the claims asserted in her petition. In support of her motion, Richardson filed a request for judicial notice of the decision in *Richardson v. City of Antioch, supra*, 722 F.Supp.2d 1133, and numerous documents in her civil case.

Respondents filed opposition on May 16, 2011. In support, they submitted a declaration of Marie C. Blits, a deputy city attorney in the city attorney's office. Blits's declaration detailed the city attorney's office's due process screens, and testified that she was the sole deputy district attorney who advised the Commission with respect to Richardson's hearing and that she did not discuss Richardson's civil case with any attorneys handling it, other than some possible scheduling matters.

After Richardson filed a reply and a second request for judicial notice (this one seeking judicial notice of certain pleadings she claimed demonstrated the

conflict of interest), Judge Quidachay heard lengthy argument on the motion. At the conclusion of the hearing, he took the matter under submission.

On July 20, 2011, after Richardson's motion was heard, she filed a third request for judicial notice. This time, she sought judicial notice of an "Order for Sealing and Destruction of Arrest Records" entered that day by the Contra Costa County Superior Court. Per that order, the court had found "that no reasonable cause exist[ed] to believe that [Richardson] committed the offense for which she was arrested" and it ordered all records of her arrest sealed and destroyed. According to Richardson, the order was "one more example of a Court ruling that Insp. Richardson did not resist or obstruct the Antioch Police Department during the June 7, 2007 incident at her home."

On July 25, 2011, Judge Quidachay entered his "Order/Judgment Denying the Petition for the Writ of Administrative Mandamus." As to the Antioch incident, he found that "the evidence [did] not support a conclusion that respondent's findings regarding the events surrounding the Antioch incident should be overturned." He explained: "The witness depositions from both parties show that there is a dispute over whether petitioner used profanity against Antioch police offers [*sic*] during the first entry, and whether petitioner failed to show her hands during the second entry. [Citations.] Due to the fact that there was no audio recording during the first entry to resolve the disputed profanity issue, and because the transcript of the audio recording during the second entry indicates petitioner was not showing her hands after repeated requests by the officers on the scene [citation], deference is given to respondent's findings regarding both entries. [¶] Thus, petitioner failed to comply with the SFPD General Orders, which require high standards of behavior during both on and off-duty conduct." Turning to the exclusionary rule, Judge Quidachay concluded that because the proceeding was civil in nature and no exceptions applied, the rule did not bar the admission of evidence of the Antioch incident. And lastly, he concluded that Richardson's conduct was not protected by the First Amendment.

Turning to the check fraud and CLETS charges, Judge Quidachay concluded that they were timely filed. As to the CLETS charges, he stated: "[T]he Court concludes that SID did not end its investigation of the CLETS issue until May 7, 2007. Based on the fact that the first memorandum was written by a member of SID, the dates from this memorandum are used in the determination of this matter. While the second memorandum may indicate that the SID investigation concluded on March 22, 2007, this second memorandum was written not by a member of SID, but by a member of MCD, a separate department. Furthermore, the second memorandum was written eight months later on January 8, 2008. It defies reason to believe that a member of a separate department who is interpreting a document from outside its own

department is better able to ascertain the conclusion of an investigation within that separate department, particularly when the document is not composed until several months later. [¶] Thus, using the dates from the first memorandum, it is determined that because the SID investigation did not conclude until May 7, 2007, the statute of limitations was tolled from the time MCD referred the matter to SID on March 22, 2007, until May 7, 2007, a period of 53 days. This supports respondent's finding that the CLETS charges were timely filed on March 12, 2008."

As to the check charges, Judge Quidachay rejected Richardson's claim that evidence of an "actual" pending investigation was required to toll the statute of limitations under Government Code section 3304, subdivision (d)(2)(A). He noted that *Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064 [55 Cal.Rptr.3d 14] (*Breslin*) did not support this proposition, nor did Richardson cite any other "case law requiring the investigative entity to provide as detailed of an 'actual' investigatory activity as petitioner desired." In the absence of any evidence showing that the Contra Costa County District Attorney did not conduct an investigation, the December 15, 2008 document evidencing its decision not to prosecute supported the Commission's conclusion that the statute of limitations was tolled until that decision.

Lastly, Judge Quidachay rejected Richardson's conflict of interest claim. He noted that to determine the procedural fairness of an administrative hearing, a court may consider evidence not presented at the administrative hearing if it is relevant to the petitioner's claim. Here, Deputy City Attorney Blits submitted a declaration that detailed the screens that were in place in the city attorney's office, evidence clearly relevant to Richardson's conflict of interest claim. And based on that evidence, he concluded the claim was without merit.

With that, Judge Quidachay denied Richardson's petition.

Richardson's notice of appeal followed on September 19, 2011.

## DISCUSSION

### A. *Richardson's Contentions*

Richardson's appeal raises numerous challenges to Judge Quidachay's denial of her writ petition. As to the charges stemming from the Antioch incident, Richardson presents four arguments: (1) Judge Quidachay improperly upheld the specifications based in part on the profanities she allegedly directed to the Antioch police officers during the first entry, even though the Commission never made any findings on that issue; (2) her statements to the

officers were constitutionally protected and, as such, it was an abuse of discretion to terminate her career based upon such statements; (3) her career should not have been terminated over her conduct during the second Antioch police department entry, because she had no obligation to show her hands since the officers were in her home unlawfully and evidence of what transpired during that entry should have been excluded; and (4) termination based upon the events during the second entry was excessive and an abuse of discretion.

Turning to the CLETS charges, Richardson's arguments are threefold: (1) there was no substantial evidence supporting the ruling by the Commission and Judge Quidachay that the charges were timely filed; (2) Commissioner Onek deprived her of a fair hearing by denying her request to examine MCD investigator Santos about the investigation conducted on the CLETS charges; and (3) it was excessive and an abuse of discretion to terminate her for her first offense of misusing the CLETS system.

As to the check fraud charges, Richardson argues only that there was no substantial evidence that the statute of limitations was tolled after the Brentwood PD closed its criminal investigation.

The final issues Richardson raises on appeal concern her conflict of interest claim. She contends that Judge Quidachay improperly considered the Blits declaration and its attachment in rejecting her conflict of interest argument. She also submits that there was no substantial evidence that the city attorney's office had complied with its policy of establishing screens.

We address Richardson's challenges out of order, beginning with her statute of limitations claims.

## B.   *The CLETS and Check Fraud Charges Were Timely Filed*

### 1.   *The Public Safety Officers Procedural Bill of Rights Act*

The statute of limitations governing the CLETS and check fraud charges is set forth in the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.), which was created by the Legislature to stop abusive practices by police departments against police officers. (Gov. Code, § 3301.) As our colleagues in Division Four described it in *Breslin, supra,* 146 Cal.App.4th at pages 1074–1075:

"The act is primarily a labor relations statute, cataloging the basic rights and protections that must be afforded to all peace officers by the public entities that employ them. [Citations.] Effective law enforcement depends on the maintenance of stable public employer-public safety employee relations— relations that benefit the public as well as public safety officers. [Citations.]

■   "One protection codified in section 3304 is the speedy adjudication of conduct that could result in discipline. [Citations.] The act provides that

disciplinary charges against a public safety officer must be filed within one year, subject to certain statutory exceptions. [Citation.] . . . It seeks to balance competing interests—the public interest in maintaining the integrity and efficiency of the police force with the individual officer's interest in receiving fair treatment." (See *Parra v. City and County of San Francisco* (2006) 144 Cal.App.4th 977, 988–989 [50 Cal.Rptr.3d 822] (*Parra*) [describing the act and its purpose].)

As noted, Government Code section 3304 provides for a one-year statute of limitations, which begins to run when the misconduct is discovered. (Gov. Code, § 3304, subd. (d)(1); *Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321 [74 Cal.Rptr.3d 891, 180 P.3d 935].) It is, however, subject to certain tolling and extension provisions. As applicable here, Government Code section 3304, subdivision (d)(2)(A) provides for tolling during a criminal investigation: "If the act, omission, or other allegation of misconduct is also the subject of a criminal investigation or criminal prosecution, the time during which the criminal investigation or criminal prosecution is pending shall toll the one-year time period." (See *Parra, supra,* 144 Cal.App.4th at p. 989.) Indeed, tolling under such circumstances is mandatory: "The act *requires* the tolling of the one-year statute of limitations while a criminal investigation is pending if the misconduct is the subject of that investigation." (*Breslin, supra,* 146 Cal.App.4th at p. 1078.)

### 2. *Standard of Review*

Legal issues involving the interpretation of Government Code section 3304 are reviewed de novo. (*Breslin, supra,* 146 Cal.App.4th at p. 1077.) As to factual issues, "we determine whether the record provides substantial evidence supporting the trial court's factual findings. [Citation.] Applying the substantial evidence test on appeal, we may not reweigh the evidence, but consider that evidence in the light most favorable to the trial court, indulging in every reasonable inference in favor of the trial court's findings and resolving all conflicts in its favor. [Citations.] The question on appeal is whether the evidence reveals substantial support—contradicted or uncontradicted—for the trial court's conclusion that the weight of the evidence supports the commission's findings of fact. [Citation.] We uphold the trial court's findings unless they so lack evidentiary support that they are unreasonable. We may not uphold a finding based on inherently improbable evidence or evidence that is irrelevant to the issues before us. [Citation.]" (*Id.* at pp. 1077–1078, fn. omitted.)

Applying this standard of review here, we conclude that substantial evidence supports Judge Quidachay's determination that the CLETS and check fraud allegations were not barred by the statute of limitations.

### 3. *The CLETS Violations*

As detailed above, Richardson's CLETS violations came to SFPD's attention on February 1, 2007, when Dwayne Johnson filed a complaint with the OCC. On February 20, the complaint was forwarded to Lieutenant Lynette-Hogue, commanding officer of MCD. On March 15, MCD requested that SID conduct a criminal investigation into the alleged CLETS violations, and SID received the file on March 22. On May 7, Lieutenant Mahoney of SID returned the file to MCD for administrative action, advising that SID was not conducting a criminal investigation. Based on the foregoing records, both the Commission and Judge Quidachay found that the criminal investigation did not conclude until May 7, 2007, and that the statute of limitations was tolled from the time SID received the matter on March 22 until May 7, 2007, a period of 53 days. As such, the statute of limitations did not run until April 14, 2008, rendering the CLETS charges filed on March 13, 2008, timely.

According to Richardson, this conclusion was wrong because the evidence showed that SID never actually performed a criminal investigation. As a result, her argument runs, the tolling provision of Government Code section 3304, subdivision (d)(2)(A) did not apply at all and the statute of limitations ran on February 21, 2008, one year after MCD received notice of the allegations. This was 21 days before the SFPD filed the amended complaint asserting the CLETS specifications. Alternatively, she argues that if the statute of limitations was tolled at all, it was tolled for only the seven days between March 15, 2007, when the file was referred to SID, and March 22, 2007, when SID received it and decided not to investigate. Even assuming a one-week tolling, the charges, according to Richardson, were still 12 days too late.

In claimed support of her argument that SID did not conduct an investigation, and thus there was no tolling, Richardson relies on three documents. The first is the May 7, 2007 Mahoney memorandum returning the file to MCD with the comment, "There is no criminal investigation being conducted on the matter of unauthorized computer usage by Insp. Marvetia L. Richardson #1246." Richardson also relies on a January 8, 2008 memorandum from Lieutenant Hogue of MCD to Chief Fong advising: "On March 22, 2007, the Special Investigations Unit received and reviewed the information contained in the OCC complaint and determined that they would not conduct a criminal investigation at this time."[11] According to Richardson, the memorandum

---

[11] The memorandum was "from" Lieutenant Hogue, but identified Lieutenant Edward Santos, Jr., as the investigating officer. During the evidentiary hearing, counsel for Richardson sought to examine Santos concerning the SID investigation. Commissioner Onek refused to allow it, ruling the testimony "irrelevant" because the statute of limitations issue had already been submitted on the papers. This, Richardson complains, deprived her of "additional evidence that the statute of limitations was tolled, if at all, for no more than seven (7) days,

"confirms that the SID only looked at the OCC complaint, and it dispels the myth that the SID waited until May 7, 2007 to make a determination not to do a criminal investigation. The SID made the decision never to investigate by *March 22, 2007*—only *seven* days after MCD initially sent the materials to SID on March 15, 2007." Lastly, Richardson cites a "Chronological Record of Investigation" maintained by MCD which contains the following entry summarizing the Mahoney memorandum: "Lieutenant Dan Mahoney, SID, wrote a memorandum stating that SID will not conduct criminal investigation re: Inspector Richardson's alleged CLETS violation." We reject Richardson's reading of the record, and conclude instead that the documents provide substantial evidence for Judge Quidachay's finding that the CLETS charges were timely.

Most significantly, and contrary to Richardson's argument, the Mahoney memorandum *supports* Judge Quidachay's conclusion that SID investigated the CLETS abuse into May, when it returned the file to MCD. It advised MCD that Richardson was under investigation by the Antioch PD for check fraud and it was initially suspected that the unauthorized CLETS searches might have been related to the check fraud. But the check fraud did not surface until *after* March 22, 2007, the date Richardson claims SID decided not to investigate the computer queries. It *necessarily* follows that SID's investigation could not have been completed by the date Richardson asserts, and *absolutely refutes* her claim that SID did not conduct any investigation into the improper CLETS searches. Instead, reason dictates that as the check fraud came to the attention of the SFPD by early April, SID investigated the CLETS searches and any possible connection to the check fraud in April. By May 7, as supported by the Mahoney memorandum, SID concluded there was no connection, and returned the CLETS file to MCD for administrative action.

Further, we—like Judge Quidachay—reject the notion that the MCD memorandum to Chief Fong controls when the SID investigation concluded. A memorandum prepared by MCD in January 2008 suggesting that SID received the file on March 22, 2007, and determined that very same day that it would not conduct a criminal investigation was not as reliable as the contemporaneous memorandum written by SID actually closing the criminal investigation. As Judge Quidachay aptly stated, "Based on the fact that the first memorandum was written by a member of SID, the dates from this memorandum [(May 7, 2007)] are used in the determination of this matter. While the second memorandum [(Jan. 8, 2008)] may indicate that the SID investigation concluded on March 22, 2007, this second memorandum was written not by a member of SID, but by a member of MCD, a separate department. Furthermore, the second memorandum was written eight months later on January 8,

---

from March 15, 2007 to March 22, 2007." There was no error in this evidentiary ruling, since the statute of limitations issue was already fully briefed and pending before the Commission.

2008. It defies reason to believe that a <u>member</u> of a separate department who is interpreting a document from outside its own department is better able to ascertain the conclusion of an investigation within that separate department, particularly when the document is not composed until several months later." The third document Richardson cites—MCD's "Chronological Record of Investigation"—is unpersuasive for the same reason.

■ In sum, the record contains substantial evidence to support the determinations by the Commission and Judge ·Quidachay that the statute was tolled from March 22, 2007, when SID received the file and opened its investigation, to May 7, 2007, when SID closed that file. The SFPD received the CLETS-related complaint on February 20, 2007, and filed charges against Richardson one year 22 days later, on March 13, 2008.[12] Accounting for the 53-day period when the limitations period was tolled, the CLETS charges were timely.

### 4. *The Check Fraud Charges*

The check fraud allegations against Richardson came to the SFPD's attention by April 9, 2007. At that time, the Antioch PD was conducting an investigation, which lasted until May 2007, at which point it turned the investigation over to the Brentwood PD.

On September 14, 2007, Brentwood PD investigating officer Detective Estrada prepared a report in which he requested that "this case be forwarded to the District Attorney's Office for review and issuance of a complaint against the three responsibles . . . ." As to Richardson in particular, he recommended charging her with seven counts of grand theft and seven counts of fraud. In the report, the case status was initially noted as "Closed," although on November 1, 2007, it was apparently reopened for followup investigation into the original checks for forgery evaluation.

On December 18, 2007, Estrada prepared a supplemental report noting that he was unable to obtain the original checks and, as such, his ability to evaluate the records for forgery was limited. The case status was noted as "Closed." Estrada's supervisor approved the report the following day.[13]

On December 16, 2008, the Brentwood PD faxed a document titled "Request for Prosecution" to the SFPD. The document, signed by a Contra Costa County deputy district attorney the previous day, advised that the

---

[12] The year 2008 was a leap year.

[13] Richardson claims that "By that time, [Estrada] was no longer recommending that the case should be forwarded to the District Attorney [*sic*] office." The supplemental report said no such thing.

district attorney's office declined to prosecute Richardson due to "Insufficient Evidence." The accompanying fax cover sheet noted, "Per your request." Judge Quidachay concluded that the district attorney's consideration of possible criminal prosecution tolled the limitations period until it communicated its final decision on December 16, 2008.

Richardson concedes that the statute of limitations was tolled for eight months while the Antioch PD and then the Brentwood PD investigated the matter. She contends, however, that the tolling ended on December 19, 2007, when Detective Estrada prepared his supplemental report and "closed" the file, not on December 16, 2008, when the SFPD was advised that Richardson would not be prosecuted. As she describes it, "That note was written almost one year *after* the [Brentwood PD] closed its investigation. It only says that there was 'insufficient evidence' to prosecute. There is no evidence that any district attorney ever conducted a criminal investigation after the [Brentwood PD] closed its files on December 19, 2007. The note from the district attorney only confirms that there was no prosecution and appears to have been written at the behest of the SFPD. The facsimile cover sheet that was attached to the note and addressed to the SFPD says, 'per your request.' " According to Richardson, this was insufficient to toll the statute of limitations, because Government Code section 3304, subdivision (d)(2)(A) requires that there be an "*actual* and *active* investigation or prosecution" pending in order for the tolling to apply. In support of Richardson's proposed "actual and active investigation" requirement, she relies on *Breslin, supra,* 146 Cal.App.4th 1064. *Breslin* is not as helpful as Richardson would have it.

The facts of *Breslin* were as follows: On May 13, 1998, four police officers were surveilling a known fugitive. Two of them fired into the car in which he was attempting to flee, killing an innocent passenger. The officers claimed they had acted in self-defense. Two criminal investigations followed: one by the OCC in response to a citizen complaint filed on June 10, 1998, and the other by the district attorney, which commenced on the day of the shooting and concluded on February 10, 1999. Ultimately, the two officers who shot at the vehicle were charged with murder and attempted murder, and all four officers were the subjects of disciplinary action. The trial court concluded that the tolling and extension provisions set forth in four different subdivisions of Government Code section 3304 (including the criminal investigation provision) combined to toll the statute of limitations such that charges filed over four years after the incident were timely. (*Breslin, supra,* 146 Cal.App.4th at pp. 1069–1073.)

The Court of Appeal reversed, concluding that the charges were untimely, but not on any ground that provides solace to Richardson. As to the criminal investigation tolling provision at issue here, the Court of Appeal simply held

that it did apply: "The facts relating to the criminal investigation tolling provision are undisputed. From May 13, 1998, until February 10, 1999, the district attorney conducted a criminal investigation into the conduct of all four of the officers involved in this shooting incident. The same incident was the subject of the June 10, 1998 complaint to the OCC. As all the requirements of the criminal investigation tolling provision are met, we find that this statute *required* that the one-year period for filing disciplinary charges against each of the four officers be tolled from the time that the OCC investigation began on June 10, 1998, through February 10, 1999, when the criminal investigation formally ended." (*Breslin, supra*, 146 Cal.4th at pp. 1078–1079.) Nowhere in the discussion of the criminal investigation tolling provision is there any mention of an "actual and active investigation" requirement, a point conceded by Richardson, who observes that "there was no discussion about the amount or quality of evidence necessary to support a decision about the tolling of the statute of limitations based upon a criminal investigation. It was not an issue."

Faced with this deficiency, Richardson turns to another provision at issue in *Breslin*—the "multiple-employee extension" set forth in Government Code section 3304, subdivision (d)(2)(D).[14] As to that, the *Breslin* court concluded that the statutory language "requires that the evidence supporting the commission's decision establish that the city was actually and actively investigating multiple employees . . . ." (*Breslin, supra*, 146 Cal.App.4th at p. 1086.) Richardson invites us to "interpret the criminal investigation and criminal prosecution tolling provision in Government Code § 3304(d)(2)(A) the same way . . . ." We decline the invitation.

As a preliminary matter, we note that the *Breslin* court offered no authority for its "actual and active" requirement. Most definitely, it was not derived from the statutory language, which offers no guidance on the nature of the investigation that is sufficient to trigger the tolling provision, other than that it must "involve[] more than one employee and require[] a reasonable extension." (Gov. Code, § 3304, subd. (d)(2)(D).) Nor does the language of the criminal investigation tolling provision suggest such a requirement, as it simply requires that a criminal investigation must be "pending."

More significantly, the imposition of a requirement that the investigation must be "actual and active" would simply be unworkable. As respondents correctly explain in their brief, "Richardson's proposed 'active investigation' standard would require a police department's disciplinary investigators, and later the courts, to monitor and oversee each step of a separate criminal unit's investigation to determine whether the investigation is sufficiently 'active' to

---

[14] At the time of the *Breslin* opinion, the extension was set forth in Government Code section 3304, former subdivision (d)(4). Government Code section 3304 was amended in 2009, when former subdivision (d)(1) through (8) was redesignated (d)(2)(A) through (H).

invoke section 3304(d)(2). That would be particularly unworkable where, as here, the criminal investigation was conducted in another county whose district attorney's office may be unwilling to provide detailed activity reports on a continuous basis. [¶] Moreover, Richardson's proposed standard is uncertain because it leaves unanswered the central question of how much an investigator must do, and how frequently, to maintain an 'active' investigation that triggers tolling. Richardson's proposal would put police departments and the courts in the position of having to determine whether various acts—such as a district attorney's review of documents, internal deliberations, or assessments whether to proceed with a prosecution—constitute a sufficiently 'active' investigation. And her theory would similarly require the Department and the courts to figure out what it means for a criminal investigation to move quickly enough—whether the investigators much take 'active' steps daily or monthly or at some other frequency to implicate the tolling provision. In short, a police department considering disciplinary action would have no way to determine reliably whether a particular level of investigatory activity is adequate to trigger tolling under section 3304(d)(2)." In sum, Richardson's proposed standard is untenable.

But even if we were to accept Richardson's position that Government Code section 3304, subdivision (d)(2)(A) and *Breslin* require that the investigation be "active and actual," we would still uphold Judge Quidachay's finding that the check fraud charges were timely. We, like Richardson, were unable to locate any case law specifically addressing the burden to prove tolling under the Public Safety Officers Procedural Bill of Rights Act. But it is irrelevant which side bore the burden of proving tolling here, because even if we were to assume that it was the SFPD's burden, we would conclude that it produced substantial evidence that Richardson's conduct was the subject of a pending criminal investigation until December 15, 2008—the day the "Request for Prosecution" from the Contra Costa County District Attorney's Office was signed advising that it was declining to prosecute due to insufficient evidence. A reasonable inference can be drawn from that document that between the time the Brentwood PD recommended prosecution and when the SFPD received notice that the district attorney would not be prosecuting Richardson, the district attorney's office was conducting its own investigation of the incident, an investigation that culminated in its decision not to prosecute. And under the applicable standard of review, we must draw that inference and construe the evidence in favor of Judge Quidachay's ruling. (*Breslin, supra*, 146 Cal.App.4th at p. 1078.) Richardson, in turn, produced *no evidence whatsoever* that between the time the Brentwood PD concluded its investigation and forwarded the matter to the district attorney on December 19, 2007, and the district attorney's December 15, 2008 notification that it was declining to prosecute no investigation was conducted. She did not, as she claims, make "a prima facie showing that the statute of limitations expired . . . ."

C.  *The Antioch Incident*

*The Antioch Specifications Were Properly Sustained Based on Richardson's Conduct During the Antioch PD's Second Entry into Her Home*

Turning to the specifications arising out of the Antioch incident, we first address Richardson's argument that her career should not have been terminated for not showing her hands during the Antioch PD's second entry into her home. This was so, she submits, because the officers were in her home unlawfully and, accordingly, evidence of what happened after the officers entered her home should have been excluded. Richardson made multiple unsuccessful attempts during the disciplinary proceeding to exclude evidence of what happened during the second Antioch PD entry on the ground that the entry was an illegal search in violation of the Fourth Amendment. She repeated these efforts during the mandamus proceeding before Judge Quidachay who, like the Commission, concluded that the exclusionary rule did not apply in that civil proceeding. We agree with the Commission and Judge Quidachay.

■ The exclusionary rule, which provides for the suppression of unlawfully obtained evidence, applies primarily in criminal cases "to insure that the law enforcement officers observe the proscriptions of the Fourth Amendment." (*In re Robert P.* (1976) 61 Cal.App.3d 310, 321 [132 Cal.Rptr. 5].) As Richardson concedes, it does not apply in most administrative hearings (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 859 [25 Cal.Rptr.2d 500, 863 P.2d 745]) and, in fact, it is rarely applied in civil actions absent statutory authorization (*Gordon J. v. Santa Ana Unified School Dist.* (1984) 162 Cal.App.3d 530, 542 [208 Cal.Rptr. 657]).

In *Emslie v. State Bar* (1974) 11 Cal.3d 210, 229 [113 Cal.Rptr. 175, 520 P.2d 991], the California Supreme Court stated that with regard to administrative proceedings (in that case, the Disciplinary Board of the State Bar of California) "a balancing test must be applied in such proceedings and consideration must be given to the social consequences of applying the exclusionary rules and to the effect thereof on the integrity of the judicial process." Courts have generally construed *Emslie* to stand for the proposition that the exclusionary rule may apply in an administrative proceeding under one of the following three narrow circumstances: (1) applying the rule would deter future constitutional violations; (2) the administrative proceeding has a close identity to the objectives of law enforcement; or (3) the social consequences of the exclusionary rule counsel in favor of its application. (See *Gordon J. v. Santa Ana Unified School Dist., supra,* 162 Cal.App.3d at p. 543.) Notwithstanding these considerations, "[c]ourts following *Emslie*

have uniformly declined to apply the exclusionary rule in civil proceedings where the rule would not deter the unlawful search at issue." (*Finkelstein v. State Personnel Bd.* (1990) 218 Cal.App.3d 264, 270 [267 Cal.Rptr. 133].) In the instant case, the circumstances dictate against the application of the rule.

Excluding evidence of what occurred after the Antioch PD's illegal entry into Richardson's home would serve no deterrent purpose. The illegal search was conducted by the *Antioch* Police Department. The disciplinary charges against Richardson were brought by the *San Francisco* Police Department. The SFPD played no role in the illegal entry. As Judge Quidachay correctly observed, "[P]unishing the SFPD would not deter the Antioch Police Department ('APD') from future violations."[15]

Nor does the second exception apply. The administrative proceeding involved disciplinary charges against a San Francisco police officer. It was a personnel matter concerning Richardson's misconduct completely unrelated to the purposes of law enforcement.

█ Finally, the social consequences of the exclusionary rule disfavor its application here. Police officers have an obligation to uphold the laws of the State of California and arrest those who violate them. In fulfilling this obligation, they must conduct their personal lives in a manner that is beyond reproach, an obligation that would be undermined by the invocation of the exclusionary rule under the facts of this case. (See *Talmo v. Civil Service Com.* (1991) 231 Cal.App.3d 210, 231 [282 Cal.Rptr. 240] ["A deputy sheriff's job is a position of trust and the public has a right to the highest standard of behavior from those they invest with the power and authority of a law enforcement officer. Honesty, credibility and temperament are crucial to the proper performance of an officer's duties."].) The integrity of the SFPD's personnel is "vital to effective law enforcement," and disrespectful and danger-inciting behavior should not be tolerated. (*Haney v. City of Los Angeles* (2003) 109 Cal.App.4th 1, 12 [134 Cal.Rptr.2d 411] ["Police officer integrity is vital to effective law enforcement. Public trust and confidence in the department as an institution and in individual officers do not exist otherwise."]; see *Governing Board v. Metcalf* (1974) 36 Cal.App.3d 546, 550–551 [111 Cal.Rptr. 724] [police officer's testimony of what occurred during an unlawful surveillance was admissible at a teacher's dismissal proceeding because the Ed. Code required that the teacher be a personal example for the students].)

Given these circumstances, Judge Quidachay properly concluded that the rule did not apply.

---

[15] As noted above (see fn. 10), the Antioch police were in fact "punished," as the charges against Richardson and her houseguests were subsequently dismissed.

Failing to persuade us that the exclusionary rule should preclude consideration of what happened during the second entry, Richardson alternatively submits that she should not have been terminated for her conduct during that entry because the police officers were in her home unlawfully and she therefore could not have obstructed a peace officer in the discharge of his or her duty. As she explains it, specification No. 2, which charged her with "[r]esisting, delaying or obstructing an officer in the discharge or attempt to discharge any duty of his or her office or employment," was derived from Penal Code section 148, subdivision (a).[16] A citizen does not have to obey an officer who is acting illegally, she asserts, and any arrest for obstructing a police officer is unlawful where the officer him or herself was not acting lawfully. She thus reasons that because the Antioch police officers were in her house illegally, she could not have obstructed them in the performance of their duties. Instead, she claims she "was well within her right to non-violently resist. She had no duty to show her hands. She did not violate Penal Code § 148, and the SFPD had no cause to punish her for lawfully and peacefully exercising her Constitutional rights. . . . She did nothing improper. She was not violent, aggressive, or rude. She only asked 'why are you guys here?' She tried to wake up her girlfriend, and she responded to Sgt. Furhman's [*sic*] questions about the location of her dogs."

Richardson's entire argument on this issue, however, misses the point. Neither the Commission nor Judge Quidachay made any findings that she violated Penal Code section 148. Rather, the findings were directed at SFPD's general orders, which hold officers to a standard of conduct distinct from the Penal Code. Rule 9 of the SFPD's general order 2.01 prohibits any behavior that "reflects discredit upon the Department" as "unofficer-like conduct subject to disciplinary action." The evidence of what transpired during the second entry demonstrated that Richardson engaged in unofficer-like conduct, substantial evidence that supported the Antioch specifications.

Lastly, Richardson challenges the sustaining of the Antioch specifications to the extent that they were grounded in · her conduct during the first entry—namely her use of profanity in calling Officer Martinez "broke ass security" and telling the officers to "fuck off" as she slammed the door shut behind them. She argues that "the superior court improperly upheld Insp. Richardson's termination based, in part, upon deference to alleged findings about profanity even though the police commission never actually made findings on that issue." Further, she contends that her statements were constitutionally protected. Because we conclude the specifications concerning

---

[16] Penal Code section 148, subdivision (a)(1) provides in pertinent part: "Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . shall be punished by a fine . . . or by imprisonment in a county jail not to exceed one year . . . ."

the Antioch incident were amply supported by the evidence of what occurred during the second entry, we need not address these arguments.

### D. *Termination Was Neither Excessive Nor an Abuse of Discretion*

Richardson contends that as to both the Antioch incident and the CLETS violations, it was excessive and an abuse of discretion to terminate her from her law enforcement career.[17] Because we conclude that all specifications were properly upheld, we need not determine whether termination for either the Antioch or CLETS specification alone was a proper exercise of discretion. That being said, we note with approval the Commission's observation that the check fraud charges alone justified immediate termination.

### E. *There Was No Conflict of Interest*

Richardson's final challenge concerns the Commission's alleged conflict of interest. She contends Judge Quidachay erred in rejecting her claim that she was deprived of a fair trial because the city attorney's office advised the Commission throughout the evidentiary proceeding, while at the same time actively defending Richardson's civil case against the SFPD, a case that, as Richardson describes it, involved the same facts, evidence, and issues that were before the Commission. Her argument is twofold. First, she contends that the evidence upon which Judge Quidachay relied to reach his conclusion—the declaration of Deputy City Attorney Blits and its attachment—was not admissible during the writ proceeding. Second, she contends that even if the evidence were admissible, it did not establish that the proper screens were in place. Both arguments lack merit.

■ As a general rule, a hearing on a writ of administrative mandamus is conducted solely on the record of the proceeding before the administrative agency. Code of Civil Procedure section 1094.5, subdivision (e), however, allows the trial court to consider evidence not presented at the administrative hearing if the evidence addresses the petitioner's claim that he or she was denied due process or a fair hearing. (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 485 [22 Cal.Rptr.3d 772]; see *Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 735 [88 Cal.Rptr.3d 610, 199 P.3d 1142] [in opposition to respondent's writ petition in the superior court, agency submitted a declaration describing the agency's internal structure and operating procedures].) But the trial court may only admit relevant evidence that, in the exercise of reasonable diligence, could not have been produced at the administrative hearing. (*Nasha, supra,* at p. 485.) Such was the case here.

---

[17] No such argument is made concerning the check fraud charges, nor does Richardson argue that termination was an excessive punishment if all specifications are upheld.

As noted above, during the evidentiary hearing, counsel for Richardson expressed concern that the city attorney's office had a conflict of interest because it was advising the Commission in the case against Richardson, while at the same time representing the SFPD in Richardson's civil case. Commissioner Onek responded to this concern, "Let me say this, I understand your concern, Mr. Cutlip. There is a wall between different parts of the city attorney's office when they have potential conflicts like this." When pressed by Mr. Cutlip for "some kind of documentation of this wall," the Commissioner declined the request, saying, "[T]his is not the venue for this concern. . . ." Mr. Cutlip persisted, asking that the Commission recuse itself from the case, which request Commissioner Onek denied. Given that Commissioner Onek was clearly not inclined to entertain any further discussion on the issue, let alone any documentary evidence, it stands to reason that the city attorney's office could not have submitted the Blits declaration or the attached memorandum during the administrative proceeding.[18] Accordingly, because the Blits declaration was relevant to Richardson's conflict of interest claim in the mandamus proceeding and because it could not in the exercise of reasonable diligence have been produced at the disciplinary proceeding, Judge Quidachay properly considered the evidence in the mandamus proceeding. With that, we turn to the question of whether the declaration provided substantial evidence that proper screens were followed, a question we answer in the affirmative. (See *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169 [56 Cal.Rptr.2d 223] [when challenging fairness of administrative proceeding, trial court findings on matters of fact are conclusive on appeal if supported by substantial evidence].)

As referenced above, in opposition to Richardson's motion for administrative writ of mandamus, where she presented the same conflict of interest argument, Deputy City Attorney Blits submitted a declaration in which she testified as follows:

"2. I am a member of the City Attorney's Office's Government Team and have been a member of that team since approximately 1998. Since approximately 2008, one of my regular duties has been to advise the City and County of San Francisco's Police Commission on various adjudicatory matters, including disciplinary proceedings. Because of my role advising the Police Commission and other adjudicatory bodies, I have closely tracked developments in California case law regarding the use of 'due process screens' in public law offices like the City Attorney's Office. I have worked

---

[18] Contrary to Richardson's assertion here, the city attorney's office did not withhold the memorandum on confidentiality grounds during the evidentiary hearing, only to subsequently waive that privilege and introduce it during the writ proceeding, nor did it ever "refuse[]" to produce it.

closely with the City Attorney's Office's Ethics and Elections Team to develop protocols to ensure that the Office uses appropriate screens in all adjudicatory matters.

"3. To ensure that attorneys in the Office can easily comply with the rules and procedures mandated by the courts, the City Attorney's Office has adopted 'standing' screens that create default assignments for attorneys involved in all administrative adjudicatory proceedings, including disciplinary hearings before the Police Commission. . . .

"4. The November 13, 2008 memorandum was sent to every attorney in the office and a copy of it is maintained on a shared electronic drive that anyone in the office can access. Attorneys in the office abide by these 'standing' screens unless the office changes the assignments for a particular matter by adopting a separate screen memorialized in writing. The City Attorney's Office has subsequently amended the screens set forth in this memorandum to reflect staffing and policy changes, but in the November 13, 2008 memorandum and in every subsequent version, I have always advised the Police Commission in disciplinary proceedings. Similarly, in each version of the memorandum, the City Attorney's Office Labor Team, including Deputy City Attorney Lawrence Hecimovich, has always advised the Police Department in these proceedings.

"5. With respect to Inspector Marvetia Richardson's hearings before the Police Commission in 2009, I was the sole deputy city attorney that advised the Police Commission. Throughout the evidentiary phases, in which the parties examined witnesses and introduced evidence, I advised and consulted with Commissioner David Onek on a regular basis. At subsequent proceedings, in which the Police Commission made its determinations and findings, I similarly advised all members of the Police Commission.

"6. During those hearings I did not discuss the Richardson proceeding, apart from some possible scheduling matters, with any member of the City Attorney's Office's Labor Team, including Deputy City Attorney Lawrence Hecimovich. Likewise, I billed my time spent on Richardson hearings to a separate billing number and maintained my separate own electronic and paper files on the matter."

Attached to Blits's declaration as exhibit A was a November 13, 2008, partially redacted memorandum memorializing the city attorney's office's due process screens.[19] In pertinent part, the memorandum provided, "[W]hen the

---

[19] As Blits testified in her declaration, the city attorney's office "consider[ed] the memorandum privileged, but the office [was] waiving the privilege as needed to defend [Richardson's]

Office establishes a due process screen, members of each of the separate teams described below, including their support staff and interns, must refrain from communicating with members of the other teams regarding the matter being adjudicated, except for communications otherwise permissible between counsel representing a party before a court or tribunal and staff of that court or tribunal. All office files in these matters maintained by one team, including electronic files and billing records, shall be kept separate from the files maintained by the other team."[20]

In short, the evidence demonstrated that in addition to the general screening practices detailed in the "Standing Due Process Screens" memorandum, Blits was the sole attorney from the city attorney's office who advised Commissioner Onek and the full Commission during the administrative proceeding that lead to Richardson's termination. Judge Quidachay concluded that the evidence demonstrated that "proper screens exist and were maintained during each of the proceedings in question." We agree that this constituted substantial evidence that the city attorney's office adhered to the proper screens.

Despite Blits's unequivocal testimony that the city attorney's office adhered to the screens in this case, Richardson contends that there was no substantial evidence that the office complied with the screening procedures. Her reasoning is as follows: "Ms. Blits' declaration . . . admits there was contact and demonstrates that Ms. Blits had information about the tort action while she was advising the Police Commission. [¶] The declaration says, '[d]uring [the Police Commission] hearings I did not discuss the Richardson proceeding, *apart from some possible scheduling matters*, with any member of the City Attorney's Office's Labor Team, including Deputy City Attorney Lawrence Hecimovich.' [Citation.] Why were they were [*sic*] coordinating scheduling during the police commission hearings? Their discussions of 'possible scheduling matters,' strongly indicates [*sic*] that Ms. Blits was aware of and had information about Insp. Richardson's related tort claims while she was actively advising the Police Commission about matters that

---

allegations in this litigation." She further explained that the redacted portions of the memorandum "describe[d] the office's screens for other adjudicatory matters unrelated to this litigation."

[20] The memorandum was addressed to then City Attorney Dennis Herrera and memorialized "due process screens for quasi-judicial matters in which the City Attorney's Office represents or advises an adjudicatory City body while also representing or advising a City department or official appearing before that body." While not the same procedural posture as Richardson's case, Blits's declaration made clear that the same due process screens were applied here. (See *Howitt v. Superior Court* (1992) 3 Cal.App.4th 1575, 1586 [5 Cal.Rptr.2d 196] ["many of the cases which raise due process concerns about these dual representation issues focus on the more obvious problem of the same lawyer acting as both advocate and adviser to the decision maker . . . [but screens are equally effective where] different lawyers in the same office perform the two functions" (citations omitted)].)

would affect the tort claims." Aside from the fact that it is arguably acceptable for public attorneys in a dual representation situation to communicate on matters of "procedure or practice . . . that [are] not in controversy" (Gov. Code, § 11430.20; see *Morongo Band of Mission Indians v. State Water Resources Control Bd., supra*, 45 Cal.4th at p. 736), such communications do not remotely suggest, let alone "strongly indicate[]," that Blits learned of any information about Richardson's tort claims. This claim is nothing more than blustery speculation that is directly contradicted by the evidence in the record—Blits's declaration.

## DISPOSITION

The order and judgment denying Richardson's petition for writ of administrative mandamus is affirmed.

Kline, P. J., and Haerle, J., concurred.